**UNITED STATES of America, Appellee,**

v.

**Gerardo S. CASTELLANOS, Appellant.**

**No. 83–1603.**

United States Court of Appeals, District of Columbia Circuit.

Argued Dec. 1, 1983.

Decided April 6, 1984.

Paul J. Kaleta (appointed by the court), Washington, D.C., for appellant.

Sharon M. Collins, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, and Michael W. Farrell and Theodore A. Shmanda, Asst. U.S. Attys., were on the brief, for appellee.

Before TAMM and SCALIA, Circuit Judges, and SWYGERT,* United States Senior Circuit Judge for the Seventh Circuit.

Opinion for the court filed by Senior Circuit Judge SWYGERT.

SWYGERT, Senior Circuit Judge:

The appellant, Gerardo S. Castellanos, was indicted for possession of cocaine with intent to distribute in violation of 21 U.S.C. § 841(a). Following a one-day non-jury trial, the district court found the appellant guilty. In this appeal, Castellanos raises two issues. He first claims that the evidence of intent to distribute was insufficient to support the conviction. He also claims that the district court erred in deny-

* Sitting by designation pursuant to 28 U.S.C. § 291(a) (1976).

ing his motion to suppress tangible evidence seized from him at the time of his arrest. We affirm the appellant's conviction.

## I

### A. The Suppression Hearing

On February 9, 1983, between 8:00 and 9:00 a.m., an unidentified man approached a Park Service gardener at Carter Barron Park in Washington, D.C., and informed him that a man lying inside a nearby car in the parking lot looked like he needed help and could be unconscious. (H.Tr. 9–10). The gardener, Carlton Wainwright, walked over to the car and found Castellanos curled-up across the front bucket seats, shaking as if he were cold. (H.Tr. 11–12, 19–20.) Wainwright and a co-worker attempted to wake Castellanos by shouting and banging on the car windows, but he did not respond. (H.Tr. 18, 25–26.) At this point, Wainwright's supervisor, William Bibbs, drove into the lot. Wainwright met Bibbs and told him there was a sick man who might have overdosed lying in a car parked in the lot. (T.Tr. 13–14, 41–43.) Bibbs immediately left to get help from Park police, whom he had just seen five blocks away. (H.Tr. 42–43, 45.) Two police officers, Rice and Swerda, followed Bibbs back to the lot, having been told by Bibbs that a man appeared dead or overdosed. (H.Tr. 42–43, 65–66, 131–32.)

By the time the officers arrived, several firemen had opened the car door and attempted to awaken Castellanos. (H.Tr. 20–22, 30–31.) Castellanos was slouching behind the wheel and seemed dazed when Rice approached him. (H.Tr. 78, 97.) Rice first asked Castellanos if he was all right. Castellanos nodded and said "yeah." Rice next asked him if the car was his. Castellanos nodded and said "yeah." Rice then requested Castellanos to produce his driver's license and car registration. Castellanos sat for a moment, leaned over, and reached under the driver's seat. (H.Tr. 67–68, 78–79.) Fearing that Castellanos could be reaching for a weapon, Rice stepped back and told him to get out of the car. (H.Tr. 47, 67–69, 114.) At the same time he unsnapped the keeper on his holster and put his hand on his gun. (H.Tr. 137.) [1]

As Castellanos got out of his car, Rice observed what appeared to be a plastic bag, containing a white powdery substance, protruding two or three inches out of Castellanos's left jacket pocket. (H.Tr. 69–71, 76.) Swerda, who had been calling in a "wales check," was near the rear of Castellanos's car when Castellanos got out and could also see "something white" in his pocket. (H.Tr. 138, 143.) Rice put Castellanos up against the car and took the bag out of his pocket. (H.Tr. 69, 71.) The bag, a clear, ziplock sandwich bag, was rolled into a tube and contained a crystalline substance. (H.Tr. 74–75, 144–47.) Suspecting that it was cocaine, Rice and Swerda advised Castellanos of his rights and placed him under arrest. (H.Tr. 82, 121–22.) The officers then looked into the back seat and saw more plastic bags containing a white powdery substance inside an open shoulder bag. (H.Tr. 80, 148–49.) The officers proceeded to search the car. The shoulder bag contained five bags similar in size and appearance to the one that had been removed from Castellanos's pocket. (H.Tr. 84–85, 149–50.) The officers looked under the driver's seat for a weapon, but did not find anything. (H.Tr. 92, 150–51.) On the floor in front of the passenger's seat, they found a vinyl briefcase, which contained a box of baking soda, small sternos, knives, spoons, towels, copper faucet fittings, and small glass bottles open at the side and top. (H.Tr. 84, 92, 152–53.) The officers also

---

1. There is some conflict in the testimony regarding when Rice placed his hand on his gun. Swerda testified that he saw Rice put his hand on his gun as he stepped back from the car. Responding to Rice's reaction, Swerda quickly approached the appellant's car and also unsnapped the keeper on his gun. (H.Tr. 137.)

Wainwright testified that Rice had his hand on his gun when he first walked up to the appellant's car. (H.Tr. 30.) The district court, noting that Wainwright was no longer standing right next to Castellanos's car when the officers arrived, relied on the officers' description of the events leading up to the arrest. (H.Tr. 192–97.)

searched for money, which Castellanos had told them about, under a cloth cover on the passenger's seat. (H.Tr. 82–83, 152.) They seized approximately $1000 from under the seat cover and an additional $217.00 from Castellanos. (H.Tr. 82–83, 152–53.) The transporting officer also recovered a small envelope containing more of the same white powder. (H.Tr. 106.)

After hearing all the evidence relating to the search and seizure, the district court denied the defendant's motion to suppress the tangible evidence seized at the time of arrest.[2] The court found that under all the circumstances, the search and seizures were reasonable and did not violate the fourth amendment.

### B. The Trial

At trial, the government introduced a stipulation, agreed to by the parties, which incorporated all testimony from the suppression hearing into the trial record. The stipulation further stated that the white substance seized by police consisted of cocaine, ranging in purity from 28% to 34% by weight, and that the total weight of the white powder was 162,540 mg. or slightly less than six ounces. The government's sole witness, Detective Johnnie St. Valentine Brown, testified as an expert on cocaine pricing and distribution. He stated that a "street" ounce of cocaine at a purity level of 15% to 20% would cost between $1800 and $2000 in the District of Columbia. (T.Tr. 19–20.) An ounce of cocaine at a purity level of 30% would cost $2800. He further indicated that cocaine at a purity level of 30% could not be purchased on the street but rather is wholesale quality which is then cut with other substances before being distributed. (T.Tr. 31–32.) On direct examination, Detective Brown testified that in his opinion the cocaine seized in this case was intended for distribution given the quantity and quality of the cocaine. (T.Tr. 26.) On cross-examination, he conceded

that he had talked to people who had used as much as 20,000 mg. of cocaine in a day, but also stated that four mg. of cocaine would be enough to satisfy an individual's craving for the drug. (T.Tr. 40–41.) Defense counsel presented no evidence. Castellanos was found guilty, and was sentenced to three to nine years imprisonment, with a special parole term of three years.

## II

In challenging the district court's denial of his motion to suppress tangible evidence, Castellanos does not dispute that the plastic bag in his pocket was visible to the officers as he stepped out of his car. Nor does he dispute that the plastic bags later found in the shoulder bag were visible, or that they could have been seized incident to a lawful arrest. His contention is that the seizures of cocaine cannot be justified under the plain view doctrine or as the result of a search incident to arrest because they were subsequent to an unlawful seizure of his person. In the appellant's view, the events leading up to the time at which Rice told him to get out of the car constitute a "seizure" within the meaning of the fourth amendment, which was not based on reasonable suspicion of criminal activity. Consequently, he contends that all evidence discovered subsequent to this unlawful seizure was tainted and must be suppressed as "fruit of the poisonous tree."

The fourth amendment's proscription against unreasonable searches and seizures requires objective justification for police intrusions upon the liberty and personal security of a citizen, including intrusions short of arrest. *Davis v. Mississippi*, 394 U.S. 721, 726–27, 89 S.Ct. 1394, 1397–98, 22 L.Ed.2d 676 (1969); *Terry v. Ohio*, 392 U.S. 1, 16–19, 88 S.Ct. 1868, 1877–79, 20 L.Ed.2d 889 (1968). It is also well-settled that the fourth amendment is not implicated by every encounter between police officers and

---

**2.** The defendant had also moved to suppress certain statements, including those directing the officers to the cash under the seat cover, on the ground that they were obtained in violation of his *Miranda* rights. The district court did not decide whether the statements should be suppressed because of the government's representation that it did not intend to use them at trial. H.Tr. 197–98.

citizens. *See, e.g., United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Gomez v. Turner,* 672 F.2d 134 (D.C.Cir.1982). Only when police have in some way restrained the liberty of an individual, either by force or a show of authority, is there a "seizure" within the meaning of the fourth amendment. *Terry v. Ohio, supra,* 392 U.S. at 19 n. 16, 88 S.Ct. at 1879 n. 16. *United States v. Wylie,* 569 F.2d 62, 66–67 (D.C.Cir.1977).

■ The question posed by this case is whether a "seizure" occurred before Officer Rice told Castellanos to leave the car. The test established in this circuit is whether police engaged in a show of authority which would lead a reasonable person, innocent of any crime, to conclude he was not free to go under all the circumstances. *Gomez, supra,* 672 F.2d at 141. *See also Mendenhall, supra,* 446 U.S. at 553–54, 100 S.Ct. at 1876–77. Castellanos contends that because Rice approached him, was wearing a park police uniform, and asked him for identification after he said he was all right, a reasonable person in his situation would have concluded he was not free to go.[3]

This court has had several occasions to consider whether a police officer's request for identification creates a sufficient show of authority to constitute a seizure. *Gomez, supra,* 672 F.2d at 139–44; *Wylie, supra,* 569 F.2d at 66–68. In *Gomez* the issue before the court was whether the "contact" procedures of the District of Columbia Police Department were facially invalid because they authorized requests for identification in situations where officers had no articulable suspicion of criminal activity. The court held that, as a matter of law, a request for identification cannot con-

stitute a show of authority sufficient to convert an innocent encounter into a seizure. *Gomez, supra,* 672 F.2d at 144. In *Wylie,* the seizure standards were applied to the facts of a specific case. There a police officer had followed an individual as he left a bank, approached him, and asked if he could speak to him for a moment. When the man said "okay," the officer took out a police form, asked him his name, and requested identification. The man replied that he did not have any identification, and further investigation ensued. The court concluded that the officer's approach and request for identification did not constitute a "seizure." *Wylie, supra,* 569 F.2d at 68.

Guided by these opinions, we must carefully consider all the relevant facts of this case to determine whether the appellant was seized when Rice approached him, asked several questions, and then requested identification. Castellanos had just been awakened by firemen as Rice and Swerda drove into the Carter Barron parking lot. When Rice walked up to the appellant's car, several firemen were standing next to the car door. Although Castellanos was awake, he was slouching over the wheel and appeared dazed. The first question Rice asked him was whether he was all right. He nodded and said "yeah." After Castellanos indicated that the car was his, Rice asked to see his driver's license and car registration. No other police officers were present at the time, and Rice did not tell Castellanos that he was a police officer, though he was dressed in a standard blue khaki training uniform with "Park Police" insignia.

■ Given all the circumstances of this case, we do not believe that the presence of

---

**3.** Appellant also contends that there were other circumstances indicating he was not free to leave. First, he relies on Wainwright's testimony that Officer Rice had his hand on his gun when he approached the appellant's car. To credit Wainwright's statement, however, we would have to discredit Officer Swerda's contrary testimony when the district court relied on the officer's testimony regarding the events after their arrival, not Wainwright's testimony. *See supra* note 1. Since there is no indication that

the district court clearly erred in crediting the officers' testimony, we will not rely on Wainwright's statement. Second, he contends that the officers parked their squad car so as to impede him from leaving. The record does not indicate the exact position of the two cars, see H.Tr. 123, 135–36, but even Castellanos concedes that the positioning of the officers' car would not have prevented him from driving away.

a park police officer together with a request for identification would have led a reasonable person to conclude that he was being compelled to respond and would not be free to leave. Indeed we suspect that a person in some sort of physical distress would feel less intimidated by police presence and a request for identification than someone who is singled out and stopped by an officer. Rice's failure to inform Castellanos that he need not respond to any questions did not convert what was a non-intrusive encounter, at that point, into a seizure.

■ Appellant does not argue that Officer Rice's subsequent order to get out of the car was impermissible under the fourth amendment. *See Pennsylvania v. Mimms*, 434 U.S. 106, 108–12, 98 S.Ct. 330, 332–34, 54 L.Ed.2d 331 (1977) (per curiam); *United States v. White*, 648 F.2d 29, 36–40 (D.C.Cir.), *cert. denied*, 454 U.S. 924, 102 S.Ct. 424, 70 L.Ed.2d 233, 235 (1981); *United States v. Moore*, 554 F.2d 1086, 1088 (D.C.Cir.1976). When the plastic bag in Castellanos's pocket became visible as he stepped from the car, seizure of the bag was proper under the "plain view" doctrine. *See Texas v. Brown*, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). The seizure of additional contraband from his car was justified as the result of a search incident to arrest. *New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981). The district court, therefore, did not err in denying the motion to suppress tangible evidence seized by the officers.

### III

Castellanos also contends that the evidence was insufficient to prove intent to distribute cocaine, an essential element of the offense, given the lack of any direct evidence of distribution. Although the appellant recognizes that intent to distribute may also be inferred from circumstantial evidence, he argues that the evidence of the quantity and quality of the drugs seized in this case does not sufficiently support an inference of intent to distribute, but rather is consistent with possession for his own use. That such an inference is insufficiently supported, he suggests, is confirmed by his "overdosed" condition when arrested and the expert testimony indicating that heavy users have been known to consume 20,000 mg. of cocaine in a day. He further contends that the paraphernalia found in his car also does not support the conviction because sternos, small glass bottles, knives, and spoons can be used for personal consumption of cocaine.[4]

■ The governing standard for reviewing the sufficiency of the evidence in nonjury cases is the same as that applied in jury cases: The conviction must be reversed when the evidence is such that a reasonable mind could not find guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1978); *United States v. Staten*, 581 F.2d 878, 882 (D.C. Cir.1978); *Jackson v. United States, supra*, 353 F.2d at 864. In applying this standard, we must view the evidence in the light most favorable to the government giving full play to the factfinder's right to determine credibility, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *Jackson v. Virginia, supra*, 443 U.S. at 319, 99 S.Ct. at 2789; *United States v. Reese*, 561 F.2d 894, 897 (D.C.Cir.1977). Further, no legal distinction is made between circumstantial and direct evidence in determining whether sufficient evidence supports the verdict. *See Holland v. United States*, 348 U.S. 121, 139–40, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1954); *Staten, supra*, 581 F.2d at 882.

■ The evidence of intent to distribute in this case includes possession of approxi-

---

**4.** The appellant also argues that the money found in the car cannot be relied upon because it was discovered as a direct result of his statements to the officers when his condition prevented him from knowingly waiving his *Miranda* rights. *See supra* note 2. We conclude that the other evidence of intent to distribute is sufficient to support the conviction, and therefore need not decide whether the money could be considered.

mately six ounces of cocaine and drug paraphernalia. A number of decisions in this circuit have already made clear that intent to distribute may be inferred from possession of drug-packaging paraphernalia or a quantity of drugs larger than that needed for personal use. *United States v. Raper,* 676 F.2d 841, 845 (D.C.Cir.1982); *Staten, supra,* 581 F.2d at 886; *United States v. Herron,* 567 F.2d 510, 513 (D.C.Cir.1977); *United States v. Davis,* 562 F.2d 681, 685–86 (D.C.Cir.1977); *United States v. James,* 494 F.2d 1007, 1031 (D.C.Cir.), *cert. denied,* 419 U.S. 1020, 95 S.Ct. 495, 42 L.Ed.2d 294 (1974). In our judgment, the quantity of the cocaine possessed by the appellant, the evidence of its value and quality, and the possession of drug paraphernalia together sufficiently support the verdict in this case.

The cocaine seized from the appellant amounted to thousands of doses, with a value of approximately $16,800. The purity level of the cocaine was that customarily possessed by wholesalers rather than users, further supporting the inference of intent to distribute. In addition, the drug paraphernalia found in the appellant's car included baking soda and other items that could be used in cutting and packaging cocaine for distribution. Nor does the appellant's apparent use of cocaine negate the reasonable inference, based on all the evidence, that he also intended to distribute the drug. We, therefore, conclude that a rational trier of fact could have found guilt beyond a reasonable doubt.

The judgment of conviction appealed from is accordingly

*Affirmed.*