961 F.2d 964
 295 U.S.App.D.C. 210
 NOTICE: D.C. Circuit Local Rule 11(c) states that unpublished orders, judgments, and explanatory memoranda may not be cited as precedents, but counsel may refer to unpublished dispositions when the binding or preclusive effect of the disposition, rather than its quality as precedent, is relevant.
UNITED STATES of America
v.
Amparo B. BOUCHEY, Appellant.
 No. 91-3120.
 United States Court of Appeals, District of Columbia Circuit.
 May 1, 1992.
 
 Before RUTH BADER GINSBURG, SENTELLE and RANDOLPH, Circuit Judges.
 JUDGMENT
 PER CURIAM.
 
 
 1
 This case was considered on the record on appeal from the United States District Court for the District of Columbia and was argued by counsel. The court has determined that the issues presented occasion no need for a published opinion. See D.C.Cir.R. 14(c). For the reasons stated in the accompanying memorandum, it is
 
 
 2
 ORDERED and ADJUDGED by this court that the judgment of the district court be affirmed.
 
 
 3
 The Clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See D.C.Cir.R. 15. This instruction to the Clerk is without prejudice to the right of any party at any time to move for expedited issuance of the mandate for good cause shown.
 
 MEMORANDUM
 
 4
 Amparo Bouchey appeals her conviction by a jury of "conflict of interest" and conspiracy to commit conflict of interest. 18 U.S.C. §§ 208, 371. The gist of the charges was that as an employee of the Department of Transportation (DOT), she developed and approved a budget for the Office of Small and Disadvantaged Business Utilization (OSDBU) which included a subcontract for an associate with whom she was negotiating for future employment. Bouchey challenges the sufficiency of the evidence, the jury instructions, and certain evidentiary rulings. We affirm the convictions.
 
 
 5
 * The conspirators were Bouchey, Wendell Harbour, and John Ricche. From December 1987 until May 1988, Bouchey was both Special Assistant to the Secretary of Transportation for Policy and Coordination of Minority Affairs and the Acting Director of the OSDBU. Harbour headed up the Minority Business Resource Center, a subdivision of OSDBU. Ricche ran the MBRC's lending program as a part-time special employee of DOT. Both Harbour and Ricche reported directly to Bouchey.
 
 
 6
 In early 1988, DOT was experiencing budget cuts. One consequence was that Ricche's contract, which was to expire in May 1988, could not be renewed. Ricche was a valued employee, however, so Harbour thought of a way to keep him on the job. At a meeting in Bouchey's office, Bouchey, Ricche and Harbour agreed to persuade Capital Bank, DOT's contractual partner in the lending program, to hire Ricche's consulting firm, Gudricch & Peers (G & P), to perform the same work Ricche had performed as a DOT employee.
 
 
 7
 The three conspirators also decided to pad the G & P contract with extra money for themselves. DOT had paid Ricche approximately $30,000 for his services. G & P was to be paid $150,000 for the same work under the subcontract with Capital Bank. (This was actually DOT money, because DOT reimbursed Capital Bank for the entire amount of the subcontract.) Ricche had originally proposed a $120,000 subcontract, but Bouchey insisted that she needed an additional $2,000 per month as "wages." Therefore, Ricche reworked the contract to include an additional $30,000--$24,000 for Bouchey ($2,000 per month for a year) plus $6,000 for Harbour. Bouchey and Ricche both understood that Bouchey would receive the money by joining G & P when she eventually left her government job.
 
 
 8
 In February of 1988, Bouchey met with Abel Holtz, the owner of Capital Bank, to persuade him to accept the G & P subcontract. She assured him that she would approve a budget increase for the program so that the costs of the new contract could be passed along to DOT. She also gave him the impression that Ricche was making approximately the same amount at DOT. Holtz agreed to the idea. Eventually, the final OSDBU budget, including the $150,000 G & P subcontract, was submitted to Bouchey for her approval. Bouchey, either herself or through a subordinate, placed a check mark on the transmittal letter attached to the budget, which indicated that she had seen the budget and approved.
 
 
 9
 Once Ricche began performing the G & P subcontract for Capital Bank, for about six months he set aside $2,000 a month for Bouchey as promised. Eventually, however, he told Bouchey that he would not pay her any of the money. Bouchey never joined G & P, but instead took another government job. Bouchey was then indicted and convicted of conflict of interest and conspiracy. (She was also charged with two bribery offenses of which she was acquitted, 18 U.S.C. § 201(b)(1) & (2).) Ricche was indicted on four similar counts and pled guilty to one count of conspiracy.
 
 II
 
 10
 Section 208 states that "whoever, being an officer or employee of the executive branch of the United States Government, ... participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a ... particular matter in which, to his knowledge, ... any person or organization with whom he is negotiating or has any arrangement concerning prospective employment, has a financial interest" commits a crime. The parties vigorously dispute the meaning of this statute, but it can be simply explained. If an executive officer participates in a matter while negotiating with (or while he has an arrangement with) someone for future employment, and knows that the person with whom he is negotiating (or has an arrangement) has a financial interest in the matter, the officer is guilty. It is not an element of the crime that the officer exploit or intend to exploit the situation for gain. Merely placing oneself in that position violates the statute. Although the statute explicitly requires knowledge only of the financial interest, "participation" in a matter and "negotiation" for employment are by common definition knowingly and intentionally undertaken. Cf. United States v. Gorman, 807 F.2d 1299, 1304 (6th Cir.1986), cert. denied, 484 U.S. 815 (1987). We therefore find no plain error in the jury instructions, which adequately conveyed these requirements. Rule 52(b), Fed.R.Crim.P.
 
 
 11
 We also have little trouble concluding that the evidence, viewed in the light most favorable to the government, was sufficient to permit a reasonable jury to find guilt beyond a reasonable doubt. See United States v. Castellanos, 731 F.2d 979, 984 (D.C.Cir.1984). As to the first element, participation in the "matter" of the subcontract, Bouchey herself admitted that she met with Holtz in an effort to persuade him to accept the arrangement. She testified, as did Holtz, that she told him the contract was for $150,000 and that DOT would reimburse the bank for the amount. That alone would constitute participation, but in addition Harbour and Ricche both testified that Bouchey suggested in a meeting in her office that the subcontract be used to set aside an amount of money for her when she left government. And Bouchey ultimately gave her official approval to the budget, which included the subcontract, by placing her check mark on the transmittal letter. A reasonable jury could certainly conclude that Bouchey had participated in the matter.
 
 
 12
 There was also ample evidence to support the charge that Bouchey was "negotiating" with Ricche for future employment during her participation. Both Ricche and Harbour testified that Bouchey directed them to prepare a budget that would include money for her when she left her government job, which they expected would be around the end of 1988. She specifically asked that Ricche's initial figure of $120,000 be increased to provide her $2,000 in monthly wages, and Ricche did in fact set that amount aside for several months. It was understood from the inception of the plan that she would join G & P and receive her money at that time, even though none of the details of her employment, such as timing, salary, and specific job description, had been worked out. Also in evidence were Ricche's notes of several meetings with Bouchey in which they had discussed the G & P contract and other G & P (non-DOT) projects in which Bouchey was planning and cooperating during this same period of time. Gov't Exhs. 1-6. In addition, at one point in their dealings, Bouchey gave Ricche a model independent contractor agreement used in the consulting industry. All of this would clearly indicate to a reasonable jury "active interest" in a future business relationship on both sides. United States v. Schaltenbrand, 930 F.2d 1554, 1559-60 (11th Cir.), cert. denied, 112 S.Ct. 640 (1991). Finally, Bouchey surely had "knowledge," at all times, of Ricche's financial interest in the subcontract. Bouchey herself admitted that she knew that Ricche's firm would receive $150,000 under the contract. In sum, a reasonable jury could conclude beyond a reasonable doubt that Bouchey was guilty of "conflict of interest." Castellanos, 731 F.2d at 984.
 
 
 13
 Bouchey also challenges an evidentiary ruling regarding Barbara Weakley, a contracting officer at DOT. Weakley testified that in her opinion Ricche's subcontract with the Bank "perhaps ... would be a conflict of interest," because Ricche "was being asked to provide advice and counsel to [OSDBU] while being employed by the Bank." Bouchey objected. The government argued the testimony was relevant because later testimony would show that Bouchey and Harbour proceeded with the contract despite their awareness of the appearance of a conflict of interest. The government's decision to put Weakley on the stand before Harbour testified placed the district court in a difficult position. Based on the government's assurances, the court allowed the testimony but instructed the jury to bear in mind that the conflict of interest was Ricche's, not Bouchey's. The government then introduced into evidence a letter, written by Weakley, stating her opinion. Under these circumstances, the trial court did not abuse its discretion. United States v. Payne, 805 F.2d 1062, 1066 (D.C.Cir.1986). At the time the testimony was offered, the future testimony of Harbour provided what appeared to be a valid basis for its admittance. Fed.R.Evid. 401, 402. The limiting instruction adequately dealt with any possible unfair prejudice or confusion. See Fed.R.Evid. 403. Although Bouchey argues that Weakley was giving a legal opinion, Bouchey established on cross-examination that Weakley's opinion was only that Ricche's relationship with the bank created the appearance of a conflict and not an actual conflict under the law. As the trial unfolded, Harbour did not testify as the government had anticipated. Bouchey never renewed her objection, however, and the court's failure to exclude the evidence at the end of the trial was not plain error. Fed.R.Crim.P. 52(b).
 
 
 14
 We have considered the remainder of Bouchey's arguments and found them to be without merit.
 
 
 15
 Affirmed.