**UNITED STATES of America, Appellee,**

v.

**J.C. Herbert BRYANT, Jr., Appellant.**

No. 95–3148.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 8, 1997.

Decided July 8, 1997.

Rehearing and Suggestion for Rehearing In Banc Denied Sept. 15, 1997.

John M. Colette, argued the cause, for appellant.

Christine E. Sykes, Assistant United States Attorney, argued the cause, for appellee. Eric H. Holder, Jr., United States Attorney, Washington, DC, and John R. Fisher, Thomas J. Tourish, Jr., and Mark H. Dubester, Assistant United States Attorneys, Washington, DC, were on brief.

Before: SILBERMAN, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

Concurring opinion filed by Circuit Judge SILBERMAN.

Concurring opinion filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

J.C. Herbert Bryant appeals his conviction on one count of impersonating a federal official in violation of 18 U.S.C. § 912[1] and one

1. This statute provides:

**Officer or employee of the United States**

Whoever falsely assumes or pretends to be an officer or employee acting under the authority

count of making false statements in violation of 18 U.S.C. § 1001.[2] For the reasons set out below we affirm his conviction on each count.

On September 2, 1992, Bryant, a Virginia resident, drove his truck into the District of Columbia and parked it near the entrance to the Mayflower Hotel, which was then hosting an Israeli diplomatic delegation. In the front window of the truck was a placard bearing the words "United States Marshal" in large bold print and in the rear compartment, visible from without, lay 6 guns: three 9 mm Beretta pistols, a .44 caliber magnum revolver, a .357 caliber magnum revolver and a .22 caliber derringer. After a brief time inside the hotel, Bryant emerged to move the truck and discovered it had attracted the attention of several government officials, among them two United States Diplomatic Security Service Agents and two officers of the Metropolitan Police Department (MPD).

After Bryant approached the truck and identified himself as its driver, he was questioned at length about the weapons and about his identity. Bryant explained that he had left the firearms in the truck after a target shooting session at a northern Virginia firing range and informed the officers that he was a Warren County, Mississippi deputy sheriff, producing a badge and identification card as proof. According to the testimony of Diplomatic Security Service Agent Mark Conord, he also identified himself as a "Special Deputy U.S. Marshal." Excerpt from 10/3/94 Trial Tr. 1, 12, 45. The MPD officers on the scene contacted the District of Columbia United States Marshal's office to clarify his status. Responding to the call, Robert Williamson, a supervisory deputy marshal, arrived at the scene a short time later. Williamson testified at trial that he also heard Bryant identify himself as a "Special Deputy U.S. Marshal." Excerpt from 10/4/94 Trial Tr. at 21, 27. In addition, both Williamson and MPD Officer Anthony Suarez testified that Bryant claimed he had left his Marshals Service credentials in a briefcase at home.

During Bryant's detention outside the Mayflower, Marshal Herbert M. Rutherford III, United States Marshal for the District of Columbia, contacted the national Marshals Service headquarters in Virginia and attempted to ascertain Bryant's official status from several Marshals Service officials. When his attempts proved fruitless, Rutherford arranged, with the consent of the MPD officers, for Bryant and his truck to be brought to the District of Columbia Marshals Service office. After a brief interview, Rutherford released Bryant and his truck but retained the firearms. It was later determined that Bryant held no official position with the Marshals Service at the time of the incident, although he had previously been a "Special Deputy Marshal"[3] for several suc-

---

of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.
18 U.S.C. § 912.

**2.** At the time of trial this statute, since amended, provided:

**Statements or entries generally**
Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 1001.

**3.** A special deputy is designated pursuant to 28 C.F.R. § 0.112, which provides:

The Director, United States Marshals Service, is authorized to deputize the following persons to perform the functions of a Deputy U.S. Marshal in any district designated by the Director:
    (a) Selected officers or employees of the Department of Justice;
    (b) Selected federal, state, or local law enforcement officers whenever the law enforcement needs of the United States Marshals Service so require;
    (c) Selected employees of private security companies in providing courtroom security for the Federal judiciary;
    (d) Other persons designated by the Associate Attorney General pursuant to 28 CFR 0.19(a)(3).
All such deputations shall expire on a date certain which shall be stated on the face of the deputation.

cessive one-year terms, the last of which ended on June 30, 1992.

Almost two years later, on June 14, 1994, Bryant was indicted on 3 counts: (1) violating 18 U.S.C. § 912 in that he "did falsely assume and pretend to be a Special Deputy United States Marshal and in such pretended character, demanded and obtained that he not be arrested by the Metropolitan Police Department for possessing and carrying weapons in the District of Columbia"; (2) violating D.C.Code § 22–3204(a)[4] in that he "did carry, openly, and concealed on or about his person, pistols, without a license issued as provided by law"; and (3) violating 18 U.S.C. § 1001 in that "in a matter within the jurisdiction of a department and agency of the United States, to wit, the United States Marshals Service, did knowingly make a false and fraudulent statement." Appellant's App. 10–11.

A bench trial was held in October 1994 at which Bryant asserted as a defense to counts 1 and 3 that he never stated on September 2, 1992 that he was then a special deputy marshal and as a defense to count two that he was a duly appointed deputy sheriff of Warren County, Mississippi, exempt under D.C.Code § 22–3205(a)[5] from the statutory prohibition against carrying pistols without a license.

The district court convicted Bryant on counts 1 and 3 and acquitted him on count 2. On count 1, the court "specifically f[ound] that Mr. Bryant claimed to be a Special Deputy United States Marshal during the course of his conversations with the law enforcement officials on the scene," "credit[ing] the clear, firm and unequivocal testimony of Special Agent Conord," which he accepted "as honest and truthful," and "the clear and unequivocal testimony of Supervisory Deputy Marshal Williamson." Excerpt from 10/16/94

Trial Tr. 7. The court expressly rejected Bryant's "self-serving testimony that he never said he was a Special Deputy U.S. Marshal." *Id.* 8. On count 3, the court similarly found "that Mr. Bryant represented to Special Agent Conord and to Deputy Williamson that he was a Special Deputy U.S. Marshal, and that he had credentials at home in a briefcase that would substantiate his claimed status." *Id.* 9. He further found "beyond a reasonable doubt that Mr. Bryant deceitfully represented that he was a Special Deputy U.S. Marshal, and this false statement is a criminal offense under 18 U.S.C. Section 1001."[6] *Id.* 10. Bryant appeals his convictions on four grounds. We address each in turn.

First, Bryant asserts that the evidence fails to support his conviction under either count 1 or count 3 because the government failed to prove that he ever represented he was a special deputy marshal. " 'The governing standard for reviewing the sufficiency of the evidence in non-jury cases is the same as that applied in jury cases: The conviction must be reversed when the evidence is such that a reasonable mind could not find guilt beyond a reasonable doubt.' " *United States v. Thomas,* 864 F.2d 188, 191 (D.C.Cir.1988) (quoting *United States v. Castellanos,* 731 F.2d 979, 984 (D.C.Cir.1984)). Bryant argues that standard has been met because the "overwhelming" evidence, including testimony of witnesses he characterizes as more credible than those on whom the district court relied, supports his version of the facts. " 'Our task,' " however, " 'is to view the evidence in the light most favorable to the government, allowing the government the benefit of all reasonable inferences that may be drawn from the evidence, and permitting the [factfinder] to determine the weight and credibility of the evidence.' " *Id.* (quoting *United States v. Sutton,* 801 F.2d

---

**4.** This section provides in part: "No person shall carry within the District of Columbia either openly or concealed on or about their [sic] person, a pistol, without a license issued pursuant to District of Columbia law, or any deadly or dangerous weapon capable of being so concealed."

**5.** This section provides in part: "The provisions of § 22–3204 shall not apply to marshals, sheriffs … or their deputies…."

**6.** He further concluded that Bryant's "assertion that he had credentials which were relevant to this issue was itself a misrepresentation within the meaning of Section 1001." Excerpt from 10/16/94 Trial Tr. 9.

1346, 1358 (D.C.Cir.1986)). We "do not ... 'weigh[ ] the evidence anew' nor do we require that the evidence 'exclude all reasonable hypotheses of innocence or lead inexorably to the conclusion that the defendant is guilty.'" *United States v. Wynn*, 61 F.3d 921, 923 (D.C.Cir.1995) (quoting *United States v. Poston*, 902 F.2d 90, 94 (D.C.Cir. 1990); *United States v. Teffera*, 985 F.2d 1082, 1085 (D.C.Cir.1993)). Deferring to the district judge's credibility determinations here, we must uphold his verdict because the testimony of Conord and Williamson, which we earlier described and which the district court expressly credited, suffices to persuade a reasonable person to find beyond a reasonable doubt that Bryant falsely identified himself as a special deputy marshal on September 2, 1992.

■ Second, Bryant asserts that count 1 of the indictment was invalid and that the evidence was insufficient to support the judge's verdict on that count because the indictment does not allege and the evidence does not support a finding that Bryant, if he represented himself as a special deputy marshal, "act[ed] as such, or in such pretended character demand[ed] or obtain[ed] any money, paper, document, or thing of value," as required under 18 U.S.C. § 912. We reject this argument as well. The indictment expressly alleges that in impersonating a special deputy marshal Bryant "demanded and obtained that he not be arrested by the Metropolitan Police Department for possessing and carrying weapons in the District of Columbia." Appellant's Appendix 10–11.[7] We must, as we noted above, accept as true the district court's finding that Bryant in fact made the misrepresentations alleged. We must likewise accept the district court's finding that Bryant "made these misrepresentations knowingly and willfully with the purpose of avoiding arrest for possessing weapons in the District of Columbia," Excerpt from 10/12/94 Trial Tr. 8, because it too is sufficiently supported by the trial evi-

dence. Suarez testified that when Bryant first returned to his truck MPD Sergeant Joseph Sandora asked whether he "was with the U.S. Marshal [sic] Service," to which Bryant replied that he was, Excerpt from 10/3/94 Trial Tr. 57–58, while Bryant himself testified that at the same time he was thinking about the weapons and the trouble they might cause him, Excerpt from 10/6/94 Trial Tr. 70. Bryant also testified that he was aware his truck might be towed and he himself taken to MPD headquarters, *id.* 75, and that he was "trying to stall for time" in the hope that someone from the Marshals Service would identify him, *id.* 78; *see also id.* 140–41. This testimony is sufficient to permit a reasonable person to find, at least inferentially, that Bryant misrepresented his status in order to avoid arrest.

■ Third, Bryant argues that the violation of section 1001 charged in count 3 is a lesser included offense of the section 912 violation charged in count 1 and therefore his conviction on both counts results in double punishment in violation of the double jeopardy clause of the fifth amendment to the United States Constitution. Again we disagree. The Supreme Court recently affirmed that whether a defendant is punished twice for the same offense in violation of the double jeopardy clause is determined "by applying the rule set forth in *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932)," namely, "If 'the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.'" *Rutledge v. United States*, —— U.S. ——, ——, 116 S.Ct. 1241, 1245, 134 L.Ed.2d 419 (1996) (quoting *Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182). While each statute here entails a misrepresentation, each also contains an element absent from the other. Section 912 requires that the misrepresentation (specifically an

---

7. Bryant does not dispute that police forbearance from arresting him qualifies as a "thing of value" within the meaning of 18 U.S.C. § 912. *See* Appellant's Br. 17–19 (discussing *United States v. Rippee*, 961 F.2d 677, 679 (7th Cir.1992) ("Forbearance by the National City Police conferred upon Rippee a substantial benefit because if Rippee had received a ticket (instead of forbearance) he may have had to pay a fine, appear in court, and perhaps even shoulder an increase in insurance premiums.")).

impersonation) be used to "demand[ ] or obtain[ ] a benefit" and section 1001 requires that the offending misrepresentation be made "within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States." Thus, there is no double punishment and no double jeopardy violation.[8]

■ Finally, Bryant contends the district court erred in denying his motion under Rule 33 of the Federal Rules of Criminal Procedure to vacate the judgment and take new testimony based on newly discovered evidence, to wit: credentials establishing his membership in the United States Marshal's Association. We find no error in the court's denial. A new trial may be granted under Rule 33 "only when five conditions are met: '(1) [T]he evidence must have been discovered since the trial; (2) the party seeking the new trial must show diligence in the attempt to procure the newly discovered evidence; (3) the evidence relied on must not be merely cumulative or impeaching; (4) it must be material to the issues involved; and (5) of such nature that in a new trial it would probably produce an acquittal.'" *United States v. Sensi,* 879 F.2d 888, 901 (D.C.Cir. 1989) (quoting *United States v. Kelly,* 790 F.2d 130, 133 (D.C.Cir.1986)). The evidence cited by Bryant fails to satisfy at least two of the criteria: it is neither material nor likely to produce an acquittal. Membership in the Marshal's Association, which the district court described as "a private booster organization with no law enforcement status whatsoever," [9] has no bearing on whether Bryant misrepresented himself to be a "special deputy marshal," the dispositive factual issue below.

For the preceding reasons, the judgment of the district court is

*Affirmed.*

**SILBERMAN, Circuit Judge, concurring:**

This is a painful case. I am left with the strong impression that appellant should not have even been prosecuted, let alone convicted. He is a victim of hostile *Washington Post* reporting and its influence on a number of federal officials more concerned with protecting their own posteriors than ensuring the fair administration of the criminal law. Unfortunately, I cannot perceive any ground that permits me, legitimately, as an appellate judge, to vote to reverse the conviction.

Appellant had been a Special Deputy U.S. Marshal for seven years by virtue of his affiliation with a group of volunteers (ARGUS) (the Armed Response Group of the United States), which loaned armored vehicles to police agencies during emergencies. In 1992, *The Washington Post* published a series of articles critical of ARGUS and of Bryant, implying that he had been granted Special Deputy status because of his family money and political connections. *See, e.g.,* Robert O'Harrow, Jr., *FBI Probes Self–Styled Police Force,* WASH. POST, May 10, 1992, at A1. The then-Director of the Marshals Service Henry Hudson wrote Bryant advising him to send Hudson a letter asking not to be reappointed, which Bryant did. His appointment thus expired on June 30, 1992, only two months before the events leading to his conviction.

Appellant can be thought guilty of a crime—assuming his politically incorrect possession of guns, attachment to a law enforcement agency, his wealth, and Virginia–Mississippi connections are not sufficient to call for imprisonment—only if he actually said at the Mayflower on September 2, 1992, that he was at that time a Special Deputy U.S. Marshal, not that he had been, which was true, or that he was closely affiliated with the Marshals Service, which also was true.

---

**8.** In fact, given that each of the statutory offenses contains an element unnecessary to the other, neither can be a lesser included offense of the other. *See Schmuck v. United States,* 489 U.S. 705, 709, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (adopting "elements test" for lesser included offense "whereby one offense is necessari-ly included within another only when the elements of the lesser offense form a subset of the elements of the offense charged").

**9.** *United States v. Bryant,* Criminal Action No. 94–249 (D.D.C. filed July 27, 1995).

A careful examination of all of the testimony, which is only sketchily presented in the majority opinion, leads me to conclude that it is very unlikely that Bryant actually said he held the Special Deputy office when trying to extricate himself from a very dicey situation, and that it was Marshal Rutherford who made the crucial representations. From the moment Deputy Williamson arrived at the Mayflower and Bryant told him he knew Rutherford, Bryant received respectful treatment. Williamson, Rutherford's subordinate, testified that he immediately tried to contact Rutherford for Bryant. When Rutherford returned the call, Williamson told him that "the police officer on the scene wanted to resolve [the matter] and either arrest Herb Bryant or wanted us to tell him that he was a Special Deputy or Deputy United States Marshal," which prompted Rutherford to ask Williamson to stall while he called headquarters. Rutherford thereafter spoke to Sergeant Sandora and admitted that he told the sergeant that Bryant was *known* by the Marshal Association. Astonishingly, he also testified that he *could not remember* if he told Sandora that Bryant was previously a Special Deputy or many details of the call, but importantly, after this discussion, the police department offered the marshals custody of Bryant to sort out the matter and the marshals accepted. So the key to Bryant's release was Rutherford's intervention.

Rutherford even rejected Sandora's suggestion that the police take custody of the guns. Instead, a marshal drove Bryant's vehicle to the courthouse, returned much of the gear (including knives) to Bryant that same day, and inventoried the guns to send to Bryant later. Bryant was escorted by Williamson to Marshal Rutherford's office. Rutherford called Deputy Director Twomey and left his own office to allow Bryant to speak in private to Twomey. Neither Rutherford nor Twomey ever asked Bryant what he told the officers on the scene or about his current status. Instead, he was released without suggestion that he had done anything inappropriate, much less in violation of federal law.

The redoubtable *Washington Post* reporter Mr. O'Harrow, learning of the incident, published a news story in the *Post* some three weeks later, on September 24, accusing the Marshals Service of intervening to help Bryant.

> After Bryant told police he had friends in the Marshals Service, a deputy marshal was sent to the scene, law enforcement officials said.... When asked why no legal action was taken against Bryant, Twomey said the District police officer 'chose simply to turn the weapons and Mr. Bryant over to the marshal.' But the District police official, who ordered the retrieval of Bryant's guns from the Marshals Service yesterday, said Bryant was released only because *the Marshals Service* 'represented to us he was a U.S. Marshals deputy.'

Robert O'Harrow, Jr., *Quasi–Police Official Freed in Gun Case*, WASH. POST, Sept. 24, 1992, at A1 (emphasis added). Only then does the question of appellant's misrepresentation arise. *Id.* ("[A]fter inquiries from the Washington Post, District Police said they plan to investigate the Sept. 2 incident and turn over their findings to the U.S. attorney in the District."). Both the marshals' headquarters and the Marshals Office in the District of Columbia disclaimed responsibility for allowing Bryant to be released and at trial blamed each other for improper behavior.[1]

Rutherford's testimony is laced with concern as to how the press would cover the story. From the moment he found out that Bryant was being detained, he thought the "situation would prove to be somewhat sticky for the United States Marshal's Service." He confessed that fear of press coverage was one reason he did not go to the scene himself. He testified that he thought Twomey deliberately tried to stay out of the matter so that Rutherford would be saddled with the decision and Twomey could have "deniability." Rutherford admitted that he talked to O'Harrow, who wrote the story describing

---

1. Rutherford as the Marshal for the District of Columbia is a presidential appointee confirmed by the Senate. The Mayflower events took place

two months before the presidential election. After the election, but before the trial, Hudson and Twomey had left office.

the representation as coming from the marshals, before the article was published.[2]

Both the ex-Director and Deputy Director of the Marshals' Office contradict all the material facts of Rutherford's story. Rutherford testified that no one at headquarters, including Twomey, told him of Bryant's actual status with the marshals. When Rutherford called headquarters to find out Bryant's status so as to decide how to handle the situation at the Mayflower, he initially did not try to reach Twomey, whom Rutherford knew to be in charge of the Special Deputy program, but instead tried to reach Hudson directly because Rutherford did not think Twomey looked out for the "best interest of [Hudson]." Only after his unsuccessful attempt to talk to Hudson, did Rutherford call Twomey, who supposedly told him that he, Twomey, didn't know Bryant's status. Indeed, according to Rutherford, Twomey *never* told him of Bryant's status. But Twomey testified that, without question, he told Rutherford, during the incident, that Bryant was no longer a Special Deputy U.S. Marshal.

Rutherford testified that he spoke with "someone" (perhaps not surprisingly, he couldn't remember whom) who told him that Bryant "was claiming to have some affiliation with or to be a deputy or special deputy United States Marshal."[3] Rutherford also claimed that, a few days after the incident, Twomey called him at home to find out if Bryant had claimed to be a Deputy Marshal. Rutherford patched Williamson into the call, and Williamson supposedly said that Bryant had claimed to be a Deputy U.S. Marshal. But Twomey flatly denied that he called Rutherford at home after the incident or that he had had a three-way call with Williamson. Twomey testified that he "never spoke with Deputy Williamson ... at any time on the day of the incident or at any time thereafter to this date" and that he "didn't even know the names of the deputies that went to the scene." It is also rather suspicious that Rutherford did not mention the three-way call in his initial statement to the inspector

general, but included it only much later in an addendum.

Both Twomey and Hudson testified that no one at the time of the incident reported to either of them that Bryant had represented himself to be a Special Deputy or Deputy U.S. Marshal. Twomey said he did speak to Rutherford about misrepresentations, but these were alleged misrepresentations of the marshals, *not* Bryant. When Twomey read the *Washington Post* article, he was "highly disturbed by the implication in the article ... that Deputy U.S. Marshals had represented to the Metropolitan Police that Mr. Bryant was a Deputy U.S. Marshal or a Special Deputy U.S. Marshal." Wanting to make "absolutely sure" that the marshals did not improperly attempt to influence the D.C. police or do anything that "would embarrass the Marshal's Service as an agency," Twomey called Rutherford at his office to determine what actually was said; Rutherford told him that no marshal had made a representation to the police that Bryant was deputized. Rutherford conceded, however, that no other marshal spoke with the metro police department nor did any other marshal have the authority to make such a representation to the police.

The district court did not resolve this troublesome conflict between Rutherford and the Director and Deputy Director but instead relied on what the judge described as "clear and unequivocal" testimony of Williamson, Rutherford's subordinate Supervisory Deputy. Yet even Williamson testified initially that Bryant "implied" he was a Special Deputy and only after being pushed said, "[Bryant] said he was a special deputy." And Rutherford admitted that when he spoke with Williamson, Williamson may have told him that Bryant was "associated or affiliated with the Marshal Service" as opposed to stating he was a Deputy or Special Deputy. Williamson's testimony, even putting aside his subordinate relationship to Rutherford, does not therefore seem so compelling.

---

2. Rutherford had also previously spoken with O'Harrow about Bryant's role with ARGUS.

3. Rutherford tried to explain away his use of the term "affiliation," which would be an accurate

characterization of Bryant's relationship with the marshals, by noting that he thought if a person is a Deputy U.S. Marshal, he is certainly "affiliated with the agency also."

The other witness relied upon by the district court was Special Agent Conord, who, the district court assumed, had "no apparent reason for bias in favor of or against the defendant, the marshals or the Metropolitan Police." It should be noted, however, that Conord and Agent Perkins were the first to respond to the potential security threat. It was Conord who allowed the matter to be turned over to the Marshal's Office. If Bryant did not claim to be a "Special Deputy United States Marshal" and was instead left to the marshals because of his less formal relationship with the service, Conord might have been thought derelict in his duties by treating a potential threat to Israeli diplomats so causally. Conord had, of course, read the *Washington Post* article and he was aware of the Justice Department and FBI investigation of the incident. Surely he knew that his own conduct—it was he who spoke to Bryant—could be subject to questioning. Yet if Bryant was thought to have stated unequivocally that he was a Special Deputy Marshal, Conord might well be less subject to criticism.

Conord's testimony, moreover, is hardly convincing. He could not "remember clearly" how long he was outside before the police arrived, could not "recall exactly" what the placard said, could not "recall exactly" whether Bryant made statements about people he knew in law enforcement, and could not "remember specifically" what the tag on the vehicle stated; nevertheless he remembered with the utmost clarity that Bryant said, "I am a Special Deputy U.S. Marshal" as opposed to saying a former Special Deputy or otherwise referring to his legitimate, albeit more complicated, relationship. Conord explained that although he was "vague on some of the technical and the specifics of the conversation, [he] remember[ed] the large picture." Perkins testified, however, that Conord and the officers on the scene told him only that Bryant was "associated with the Marshal's Service or he's with the Marshal's Service. But nobody ever told me Mr. Bryant says he is a Special Deputy Marshal." And, at one point, Conord himself testified that Bryant claimed an "affiliation" with the Marshals Service, prompting the district court to ask why Bryant would say

"affiliation" when he was supposedly representing himself as a Special Deputy. "A lot of things didn't seem to add up at the time," was Conord's explanation.

Too much about this case does not add up. It is not just the shaky and unreliable testimony against Bryant, it is also the testimony from unbiased sources strongly supporting Bryant. Officer Suarez, the Metropolitan Police Department officer conducting the inquiry of Bryant at the scene, did not once mention in his contemporaneous notes that Bryant claimed to be a Special Deputy Marshal. And Carl Crawford, the security director for the Mayflower, vouched for Bryant's depiction of the events. Bryant claimed to be "associated with the United States Marshal's Service" and "use[d] names of people that were in the Marshal's Service" but did not say that he was a U.S. Marshal, according to Crawford, who paid close attention to Bryant's answers because of his "concern ... for the people that were in the hotel." Crawford thought Bryant was merely trying to show he was well-connected with law enforcement, which of course he was.

As a Justice Department alumnus, I simply cannot imagine approving, had it come to me, the prosecution of Bryant, who seems to be an unfortunate scapegoat. As a judge, I cannot understand how the district judge could have concluded that the government made out its case beyond a reasonable doubt. But I am powerless, given the scope of review of a district judge's factual findings, from seeking to rectify this gross injustice.

KAREN LeCRAFT HENDERSON,
Circuit Judge, concurring:

I write separately for two reasons. First, I share the concerns expressed in Judge Silberman's concurring opinion and agree that, given the circumstances, Bryant should not have been prosecuted or convicted. Second, I believe that a special deputy United States marshal is not an "officer or employee of the United States" the impersonation of which is proscribed by 18 U.S.C. § 912.

Special deputy marshals are designated under the purported authority of 28 C.F.R. § 0.112 which provides that "[t]he Director, United States Marshals Service, is autho-

rized to deputize ... to perform the functions of a Deputy U.S. Marshal in any district designated by the Director," among others, "[s]elected federal, state, or local law enforcement officers." Whatever other effect such a special deputation may produce, it cannot transform a local law enforcement officer into a federal one. The Director's appointment authority is fixed by statute. He "is authorized to appoint and fix the compensation of such employees as are necessary to carry out the powers and duties of the Service" and "may designate such employees as law enforcement officers." 28 U.S.C. § 561(f).[1] He has no statutory authority to appoint anyone other than a Marshals Service employee or official as an "officer" of any kind.[2] Thus, his deputation of an individual outside the Service as a special deputy marshal does not confer "federal officer" status on that individual and, therefore, impersonation of a special deputy marshal should not violate section 912.[3] Nevertheless, I am constrained to join in affirming Bryant's conviction on count 1 because circuit precedent holds that the statute can be violated even when the assumed office does not exist. *See United States v. Maxwell,* 920 F.2d 1028, 1037 n. 11 (D.C.Cir.1990) (citing *United States v. Rosser* 528 F.2d 652, 656 n. 14 (D.C.Cir.1976)). Although I believe the circuit precedent is wrong, I am nevertheless bound by it.

---

1. Section 561(f) provides in full: "The Director is authorized to appoint and fix the compensation of such employees as are necessary to carry out the powers and duties of the Service and may designate such employees as law enforcement officers in accordance with such policies and procedures as the Director shall establish pursuant to the applicable provisions of title 5 and regulations issued thereunder."

2. The statutes repeatedly emphasize that the Director's authority extends only over officials and employees *of the Marshals Service,* a class that does not encompass special deputy marshals. The Director serves "at the head of the United States Marshals Service," 28 U.S.C. § 561(a), and is authorized to administer oaths and to take affirmations "of officials and employees of the Service," 28 U.S.C. § 561(h). In addition only an "official of the Service" may "be designated by the Director" to carry firearms and to make warrantless arrests. 28 U.S.C. § 566(d).

3. I am aware that the Ninth Circuit has concluded that a special deputy is protected by 18 U.S.C. § 111, entitled "Assaulting, resisting, or impeding certain officers or employees," which prohibits assaults against specific persons enumerated in 18 U.S.C. § 1114. *United States v. Diamond,* 53 F.3d 249, 252–53 (9th Cir.1995). In *Diamond,* however, the Ninth Circuit merely construed the language of section 1114, concluding that a special deputy marshal fell within the statutory category of "any United States ... deputy marshal." The court did not address the scope of the Marshals Service Director's statutory appointment authority and did not hold that a special deputy is a "federal officer."