# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 3, 2017        Decided July 21, 2017

No. 15-3044

UNITED STATES OF AMERICA,
APPELLEE

v.

SHERRI DAVIS,
APPELLANT

---

Consolidated with 15-3048, 15-3089, 15-3091

---

Appeals from the United States District Court
for the District of Columbia
(No. 1:14-cr-00037-1)
(No. 1:14-cr-00037-2)

---

*Lisa B. Wright*, Assistant Federal Public Defender, argued the cause for appellant Andre Davis. *Adam H. Kurland*, appointed by the court, argued the cause for appellant Sherri Davis. With them on the briefs were *A.J. Kramer*, Federal Public Defender, and *Beverly G. Dyer*, Assistant Federal Public Defender. *Tony Axam Jr.* and *David W. Bos*, Assistant Federal Public Defenders, entered appearances.

*Alexander P. Robbins*, Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief

was *Gregory Victor Davis*, Attorney.  *Frank P. Cihlar*, Attorney, entered an appearance.

Before: ROGERS and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*:  Sherri Davis and her son, Andre Davis, appeal from their convictions of conspiracy to commit tax fraud and related offenses.  Sherri owned a tax preparation business, which the Internal Revenue Service determined was filing returns that falsely reported charitable and business deductions.  A key government witness, LaDonna Davis, who was Sherri's niece and employee, described at trial how the business operated generally, and specifically how Sherri had taught her to prepare false returns.  Andre worked with his mother later on.  Both Sherri and Andre challenge their convictions on the grounds of prosecutorial misconduct during closing arguments to the jury and various evidentiary errors by the district court.  Andre also contends that there was insufficient evidence to demonstrate his guilt beyond a reasonable doubt and suggests that the verdict against him on two counts is explained, among other reasons, by the government's mischaracterizations of the evidence during closing arguments.  Upon consideration of the weakness of the evidence offered against Andre and its centrality to the issue of his *mens rea*, we conclude that the prosecutor's blatant misstatements of key evidence during closing arguments, in the absence of any steps to mitigate the resulting prejudice, require reversal of Andre's convictions.  Further, we conclude that the evidence against Andre was insufficient and consequently he is not subject to retrial.  Finally, finding no such prejudice from the closing arguments as to Sherri, and concluding her evidentiary challenges are unpersuasive, we affirm Sherri's convictions but

remand her case for resentencing and for consideration of her claims of ineffective assistance of counsel.

**I.**

In 2003, Sherri Davis registered 2FT Fast Facts Tax Service with the Internal Revenue Service ("IRS"). 2FT was a tax preparation business aimed at recovering its clients' tax withholdings and maximizing their tax refunds. Sherri's niece, LaDonna Davis, began working for 2FT in 2006, first doing clerical work but later preparing and filing tax returns herself. LaDonna would work during the day and into the evenings, and Sherri, who was a public school teacher, would join her once the school day ended and sometimes work on returns until midnight. 2FT also employed other individuals to help around the office, but only Sherri and LaDonna prepared tax returns. Clients were charged between $99 and $500 for each return, often taken as a deduction from the client's refund without the client knowing the specific amount. During tax season, 2FT would prepare twenty to thirty returns a day, seven days a week. Fees, annually totaling hundreds of thousands of dollars, were deposited in Sherri's bank account; employees were paid in cash.

An IRS investigation of 2FT led to an interview with Sherri about the responsibilities of tax preparers. Subsequent undercover investigations in 2010 and 2011 captured LaDonna on videotape preparing false returns for undercover IRS agents. In April 2011, the IRS executed a search warrant for 2FT's business location at 1841 Burke Street, SE, Washington, DC, where Sherri and LaDonna also lived, and seized computers and files. At the time, IRS agents also interviewed LaDonna and she agreed to cooperate with their investigation. In October 2011, LaDonna entered into a plea agreement admitting conspiring to defraud the United States of more than $14 million. She pled

guilty to conspiracy to defraud the United States, in violation of 18 U.S.C. §§ 2, 371, and aiding and abetting first degree theft, in violation of D.C. Code §§ 22-3211, 22-3212, 22-1805.  That same month, the IRS expelled Sherri from its electronic filing program and suspended 2FT's electronic filing numbers ("EFINs").  Sherri continued her tax preparation business under a new name, Davis Financial Services.  Instead of identifying Sherri as owner, however, Davis Financial Services' February 2012 IRS EFIN application listed Andre as the principal and the primary contact.

Sherri was indicted for federal tax violations two years later, in February 2014.  A superseding indictment filed in July 2014 named Sherri and Andre as defendants and LaDonna as an unindicted co-conspirator.  Count 1 charged Sherri and Andre with conspiracy to defraud the United States by preparing and filing fraudulent and false individual income tax returns, in violation of 18 U.S.C. §§ 2, 371.  Counts 2 through 33 charged Sherri with willfully aiding and assisting in the preparation of false returns, in violation of 26 U.S.C. § 7206(2); Andre was charged with the same violation in Counts 6, 15, 19, and 22.  Counts 34 through 36 charged Sherri with filing false individual returns, in violation of 26 U.S.C. § 7206(1) and 18 U.S.C. § 2.  The district court granted the government's pretrial motion to dismiss Counts 2 through 6.

At trial, eleven of Sherri's clients testified.  According to the government,

> all t[old] essentially the same story: each worked for an employer that withheld federal income taxes from the wages it paid, each went to Sherri's house between 2007 and 2013 to file a tax return for the prior year, and each (with a single exception) used Sherri to prepare returns for multiple tax years.  Most of the

clients specifically identified Sherri as either the only person who prepared their returns or one of two people who prepared them. All of the returns reported huge false deductions . . . .

Appellee Br. 11 (footnote omitted).

LaDonna was the government's star witness. She had come to live with Sherri when she was sixteen years old. She testified that Sherri taught her how to prepare tax returns, which primarily meant getting clients back what was withheld from their paychecks, usually by inventing or exaggerating charitable deductions and business losses and expenses. She described in some detail how Sherri operated her tax preparation business. For example, Sherri had instructed her to assign values for charitable donations up to several thousands of dollars on blank receipts provided either by 2FT or the clients. Eventually, LaDonna testified, "it all became like a routine" and she began filling in charitable deductions without even asking clients if they had receipts. Trial Tr. 95 (Jan. 20, 2015 (pm)).

LaDonna also testified that Sherri would sometimes come in and finish returns when LaDonna had been logged into the e-filing system, so returns completed by Sherri "would come in under my name" — that is, returns finished by Sherri listed LaDonna as the preparer. *Id*. at 92. As another example of how Sherri operated, LaDonna recounted how she had prepared a return showing a client owed money and, after the client became upset, Sherri made changes to the return, "put[ting] some stuff in," so that the client would no longer owe anything. *Id.* at 18. Subsequently a number of clients were audited after LaDonna misinterpreted Sherri's instructions and included the total mileage, not the annual mileage, on vehicles owned by clients as part of their business deduction calculation. Sherri told LaDonna to stop reporting total mileage and introduced the

clients to a woman who could create fake mileage logs for them to provide to the auditors.

LaDonna testified at trial that once she had learned about the audits and that an IRS representative had spoken with Sherri, she began to suspect something was wrong and stopped filing "Schedule C" forms showing business profits and losses. Her concerns were heightened, she claimed, when IRS agents executed the search warrant in April 2011. At the time, LaDonna telephoned Sherri, who was in Las Vegas, to alert her to what was happening, and Sherri told her to tell the agents that she had learned how to prepare tax returns on her own and to "go get [her]self committed so that [the agents] would think that [she] was crazy." Trial Tr. 12 (Jan. 20, 2015 (pm)). LaDonna did not take Sherri's advice and relations between the two women became strained. (On cross examination, LaDonna conceded that she never told the IRS agents during their interviews of her that Sherri had told her to say something that she knew was untrue.) LaDonna testified that they subsequently had "a falling out" because she kept asking Sherri if anything was wrong and, while Sherri kept trying to reassure her that nothing was wrong she also wanted LaDonna "to lie about the fact that she . . . [had] taught [LaDonna] how to do taxes." Trial Tr. 69 (Jan. 20, 2015 (pm)). LaDonna stopped working for 2FT and moved out of 1841 Burke Street, SE; Sherri continued preparing tax returns, telling LaDonna "no one told her that she had to stop." *Id.* at 14.

As to Andre, LaDonna testified that he would come home during his spring and summer breaks from Lincoln University in Pennsylvania, but that he was neither an employee of 2FT nor prepared tax returns. Sometime after the search warrant was executed in April 2011, however, LaDonna learned Andre was planning to help Sherri prepare tax returns after his graduation. She told him not to get involved in view of "everything else that

was going on," and Andre responded that the investigation "wasn't a big deal, and that it was just going to go away." *Id.* Indeed, LaDonna testified that the entire Davis family thought the IRS investigation would go no further and was her fault for causing the client audits.

The government introduced evidence that in March 2012 the IRS accepted an application for a new EFIN for Davis Financial Services, described as a sole proprietorship with Andre listed as the primary contact and the principal. According to records from TaxWise, a tax-preparation software company, Davis Financial Services received $16,224 in fees in connection with the filing of tax returns for 2012, and $7,829.95 in fees from 2013 returns, amounts significantly less than the annual fees earned by 2FT through e-filings in prior years, which ranged from approximately $70,000 to $159,000. A spreadsheet from TaxWise also listed "Andre Davis," "Davis Financial Services," and "1841 Burke Street SE" alongside bank account and routing numbers. The government did not offer evidence of who owned the bank account.

Neither Sherri nor Andre testified in their defense. Sherri presented seven character witnesses to testify to her honesty and trustworthiness, and to elicit testimony to impeach LaDonna's testimony and generally attack her credibility. Sherri also called IRS Special Agent Abubaker Naim as a witness to confirm that only LaDonna was present during the two times undercover IRS agents went to 2FT, ostensibly to have their tax returns prepared. Andre did not call any witnesses in his defense.

At the close of all the evidence, the district court granted Andre's motion for judgment of acquittal as to Count 15, relating to Deborah Johnson's 2012 false tax return, ruling that the government presented only "speculation" that Andre

knowingly assisted in the preparation of a false return "when all we really have is [that Johnson] said she saw him do something on a computer" and "handed [her return] to her."  Trial Tr. 15 (Jan. 28, 2015).

The jury found Sherri and Andre guilty on Count 1, conspiracy to defraud the United States, and Sherri guilty of aiding and assisting taxpayers in the preparation and filing of false returns on Counts 7–14, 16–18, and 20–36.  It also found Andre guilty on Count 19 for aiding and assisting the preparation and filing of Thomas Jaycox's false 2012 tax return showing charitable gifts of $51,000 and business and miscellaneous expenses of $25,259.  The district court denied Sherri's motion for a new trial based on prosecutorial misconduct during closing arguments.  It also denied both defendants' motions for judgment of acquittal notwithstanding the verdicts.  Sherri was sentenced to concurrent terms of forty-eight months of imprisonment and thirty-six months of supervised release, and ordered to pay restitution of $642,103.  Andre was sentenced to sixty months of probation and ordered to pay restitution of $37,537.  The district court denied their motions for a new trial under *Brady v. Maryland*, 373 U.S. 83 (1963), based on the disclosure at sentencing that LaDonna had admitted filing false personal tax returns during pre-trial interviews.  Both defendants appeal, and we turn first to Andre's challenges to his convictions on Count 1, conspiracy, and Count 19, aiding and abetting the preparation and filing of a 2012 false income tax return for Thomas Jaycox.

**II.**

To prove Andre's guilt beyond a reasonable doubt on Count 1, conspiracy, the government had to prove that he knowingly agreed with Sherri (or another person) to defraud the federal government of money or to deceptively interfere with

the lawful functions of the IRS. *See Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924); *United States v. Treadwell*, 760 F.2d 327, 333 (D.C. Cir. 1985). To prove Andre's guilt on Count 19, the government had to prove that he aided or assisted in the preparation or presentation of Jaycox's false tax return with a specific intent to violate the law. *Cheek v. United States*, 498 U.S. 192, 200–01 (1991). Andre maintains that neither Jaycox's testimony about his false 2012 tax return, nor the 2012 EFIN application, nor LaDonna's testimony about her conversation with him, nor the TaxWise records listing his name on a spreadsheet indicating where Davis Financial Services' fees were deposited showed he knowingly and intentionally aided in the filing of Jaycox's false tax return (Count 19) or joined in an agreement to further the conspiracy's object, that the object was illegal, and that he had a common understanding to violate the law (Count 1). In his view, the verdict may be explained, among other reasons, by the government's mischaracterization of evidence during closing arguments. We agree.

## A.

It is well established "that the prosecutor may not refer in the opening or closing statement to evidence not admitted at trial." *United States v. Valdez*, 723 F.3d 206, 209 (D.C. Cir. 2013) (quoting *United States v. Small*, 74 F.3d 1276, 1282 (D.C. Cir. 1996)). Generally, the court considers three factors in assessing whether improper prosecutorial argument sufficiently prejudiced the defendant to require reversal of the judgment of conviction: "[1] the closeness of the case, [2] the centrality of the issue affected by the error, and [3] the steps taken to mitigate the effects of the error." *Id.* (quoting *Small*, 74 F.3d at 1280); *see United States v. McGill*, 815 F.3d 846, 918 (D.C. Cir. 2016). When, as here, the defendant did not object to the prosecutor's alleged misstatements in the district court, our review is for plain error. *Id.* at 888.

To set the context for assessing Andre's contention that the court must reverse his convictions on both counts because of prosecutorial misconduct during closing arguments, we summarize the relevant evidence, and this necessarily entails some overlap with our consideration of Andre's sufficiency challenge. The government's case against Andre as to both Count 1 and Count 19 was thin. *See* Part II.B, *infra*. Although the evidence established that Andre began working with his mother after graduating from college and that false tax returns were filed under the Davis Financial Services EFIN during this period, the evidence of Andre's knowing participation in Sherri's tax fraud scheme was equivocal, at best. LaDonna testified that she cautioned Andre against working for Sherri, but she did not specify why she thought doing so "wasn't a good idea." Trial Tr. 81 (Jan. 20, 2015 (pm)). Thomas Jaycox testified on direct examination that Andre had prepared his 2012 tax return, but qualified his testimony on cross-examination and redirect by clarifying that Sherri had, in fact, also "put[] information on" and "finalize[d]" his return after Andre had worked on it. Trial Tr. 47, 80 (Jan. 22, 2015 (am)). The evidence thus failed to establish who entered the false deductions into Jaycox's return; Sherri was just as, if not more, likely to have done so than Andre. The remaining evidence against Andre, such as Andre's name on the EFIN application and other documents, at most confirms only that he was engaged in operating a tax-preparation business, not that he had the specific intent to file false returns or otherwise knowingly joined Sherri's conspiracy to defraud the United States.

Examination of the prosecutor's closing arguments reveals multiple misstatements of this evidence and, given the gaps in the government's evidentiary case, their prejudicial effect is readily apparent. For instance, the prosecutor told the jury that Andre personally designated the bank account into which tax preparation fees were deposited in 2013 and that Andre and

Sherri made a "staggering amount of money" but failed to report such income in their individual tax returns. Trial Tr. 170 (Jan. 28, 2015). Even assuming that the first point is not false, because Andre's designation of the bank account might be viewed as a reasonable inference from the TaxWise evidence, there is no evidentiary basis for the second, nor does the government point to any on appeal. The evidence of earnings and income reporting related only to Sherri's receipt of fees and failure to accurately report her individual income to the IRS. There was no comparable evidence as to Andre. Not only was there no direct evidence Andre received fees for preparing and filing false returns, much less in "staggering amounts," as the prosecutor told the jury, Trial Tr. 170 (Jan. 28, 2015), there was no evidence Andre under-reported his individual income on his tax returns. Lumping Andre together with Sherri in this manner was clearly prejudicial to Andre. The prosecutor also misleadingly minimized Sherri's role in completing Jaycox's 2012 return, telling the jury that Sherri only "came over to make sure it was okay, or something to that effect," *id.* at 88, when Jaycox testified that Sherri "finalize[d]" his taxes and "finished everything else out" on his 2012 return. Trial Tr. 47, 80 (Jan. 22, 2015 (am)).

Even more critically, the prosecutor blatantly misrepresented the evidence regarding Andre's *mens rea*. First, in the opening portion of his closing argument after asking the jury, "how do we know that the Defendant Andre Davis acted willfully," the prosecutor told the jury that LaDonna had told Andre about the criminal charges she was facing and that Andre had reassured her by saying, "Don't worry. I know what I'm doing." Trial Tr. 96 (Jan. 28, 2015). The prosecutor then told the jury: "So he knows. He knows that 2FT is under criminal investigation, but yet he continues to file. . . . He acted willfully with the specific intent to violate the law." *Id.* at 97. But this did not accurately recount LaDonna's testimony. Even

now, the government's brief misstates that there was evidence LaDonna had told Andre about the criminal nature of the investigation in which she was involved. *See* Appellee Br. 17. In fact, LaDonna's account of the conversation never indicated that she had told Andre or that he was otherwise aware of the criminal nature of the IRS investigation of 2FT or that Sherri, rather than LaDonna alone, was implicated in it. Second, in rebuttal closing argument, the prosecutor again asked "how do we know that these defendants were trying to commit fraud," and this time told the jury that it's because "[t]hey're photocopying Goodwill receipts and whiting them out . . . to have back-up documents to support the $47,000 and $50,000 deductions for Thomas Jaycox[.]" *Id.* at 170. But the evidence regarding the business providing clients with blank Goodwill or other charitable receipts pertained only to years prior to the time when Andre began working with his mother and his tenure at Davis Financial Services. Jaycox brought his own receipts in 2012. The government's response on appeal, that the "Sherri *or* Andre" statement is technically true, because Sherri provided blank Goodwill receipts, rings hollow; the government tarred Andre with evidence that it implicitly acknowledges had nothing to do with him. *See* Appellee Br. 46.

The government's evidence that Andre had the requisite *mens rea* for the offenses for which he was convicted was close to none and at best minimal. *See* Part II.B, *infra*. Perhaps recognizing the weakness in the government's case, the prosecutor sought to convince the jury during closing arguments that Andre knew about the fraudulent activity of the 2FT business and nonetheless knowingly joined in it once he began working with his mother. The prosecutor did so by inappropriately bolstering what little evidence there was. No remedial or limiting instruction was given to the jury at any point to mitigate the obvious prejudice to Andre. But for the government's misrepresentations of key evidence, the court is

left with the distinct doubt that a jury would have found beyond a reasonable doubt that Andre was knowingly involved in preparing and filing false tax returns and thereby perpetrating the fraudulent tax scheme. The prosecutor's blatant misstatements on that critical issue jeopardize the court's confidence that the prosecutor's misconduct during closing arguments did not affect the jury's verdict against Andre. *See Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946); *Valdez*, 723 F.3d at 209 (citing *Gaither v. United States*, 413 F.2d 1061, 1079 (D.C. Cir. 1969)). "This test applies regardless of whether our review is for harmless error or [as here] plain error." *United States v. Watson*, 171 F.3d 695, 700 (D.C. Cir. 1999); *see McGill*, 815 F.3d at 918. Standard jury instructions, such as that "statements and arguments of counsel are not evidence," Trial Tr. 33 (Jan. 28, 2015), and that it is the jury's "memory of the evidence . . . that should control during . . . deliberations," *id.* at 32, have long been recognized not to be "a cure-all for such errors," *Gaither*, 413 F.2d at 1079. Given that the evidence against Andre "was not such that his conviction was by any means a certainty," the prosecutor's egregious misstatements of it during closing argument amount to plain error, and accordingly, require reversal of Andre's convictions. *United States v. Richardson*, 161 F.3d 728, 737 (D.C. Cir. 1998).

**B.**

Although the prosecutor's statements during closing arguments to the jury alone would warrant vacating Andre's convictions, the court must also determine whether the government may retry him. The court therefore proceeds to address Andre's challenge to the sufficiency of the evidence against him. Because we conclude, for the following reasons, that the evidence was insufficient to prove his guilt on either Count 1 or 19, he is not subject to retrial. *See Burks v. United States*, 437 U.S. 1, 13–17 (1978); *United States v. Williams*, 827

F.3d 1134, 1162 (D.C. Cir. 2016).

The government, while acknowledging Andre's innocent explanations for the evidence offered against him, responds that it is incriminating when viewed collectively. *See* Appellee Br. 26 (citing *United States v. Bryant*, 117 F.3d 1464, 1468 (D.C. Cir. 1997)). As the government sees it, the fact that Andre's name appears on the 2012 EFIN application, on the TaxWise records, and on Jaycox's 2012 tax return suffice, in light of LaDonna's testimony that Andre was "going to be working with [his mother]," doing taxes, Trial Tr. 14 (Jan. 20, 2015 (pm)), to uphold Andre's convictions. *See id.* (citing *United States v. Hough*, 803 F.3d 1181, 1188 (11th Cir. 2015)). It distinguishes the evidence in Andre's case from *United States v. Gaskins*, 690 F.3d 569 (D.C. Cir. 2012), where there was no evidence the defendant ever discussed or was in the presence of unlawful contraband or had access to the apartment, leased under his name, where the contraband was found. *See id.* at 26–27. Viewing the evidence most favorably to the government, *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *McGill*, 815 F.3d at 917, however, the court concludes that the evidence of Andre's *mens rea* was, at most, equivocal and thus insufficient to sustain his convictions; *see Direct Sales Co. v. United States* 319 U.S. 703, 714 (1943); *United States v. Spinner*, 152 F.3d 950, 957 n.1 (D.C. Cir. 1998).

The clients' testimony and LaDonna's testimony confirm that Andre had agreed to work with his mother on preparing tax returns. But that alone is not the same as showing the requisite *mens rea* to join Sherri's conspiracy. Most of LaDonna's testimony, and that of Sherri's clients, was about Sherri and LaDonna preparing their tax returns and the general operations of the 2FT tax preparation business. LaDonna also testified that when she learned after the search warrant was executed that Andre was going to begin working with his mother on taxes, she

had told him "that wasn't a good idea, that he shouldn't." Trial Tr. 81 (Jan. 20, 2015 (pm)). But she offered no relevant details about Andre's subsequent conduct or knowledge. And she acknowledged at trial that the Davis family was blaming her for the audits, and "everybody thought that it [i.e., the IRS investigation] was not that serious . . . that it was just going to . . . go away," and "that none of this was going to proceed any further." *Id.* This evidence demonstrates that Andre agreed to work for his mother despite knowledge of some type of investigation, but it does not show that he knew his mother was committing tax fraud, much less that he was involved in falsifying tax returns, unlike the government's clear evidence of his mother's and LaDonna's knowing culpability. Being present and working on clients' tax returns, without more, does not show the requisite specific intent.

Adding Andre's name on the EFIN application and the TaxWise summary spreadsheets does not add up to a showing that Andre knowingly participated in a conspiracy either. That Andre's name was listed as the principal and the point of contact for Davis Financial Services in its EFIN application is not the same as evidence these designations were the result of his action or agreement. The application in the record is a copy of an electronic filing and does not indicate who actually submitted it to the IRS. Signatures on the filed 2012 tax returns were also electronic, and Sherri was known to complete tax returns under her employees' computer log-ins, such that their names, rather than hers, would be listed as the preparer. That Andre's name is listed as the return preparer on Jaycox's 2012 return is not the same as showing that Andre entered the false information or condoned those entries by Sherri, or even knew that Sherri was entering false information on the return. Similarly, that Andre's name was listed as the point of contact in a TaxWise summary spreadsheet provides no more evidence of his *mens rea* than the inclusion of his name on the EFIN

application. Even if Andre received Davis Financial Services' tax preparation fees or directed where they should be deposited, this would show only that Andre had joined the business, not that he had knowledge of and assisted Sherri in conspiring to defraud the government or in filing false returns with the IRS.

Thus, the government's case as to both Count 19 and Count 1 largely rested on the testimony of client Thomas Jaycox that he "remember[ed] Andre Davis doing [his] taxes one particular year" and that his 2012 federal tax return, which included false deductions, listed Andre as the tax preparer. Trial Tr. 54 (Jan. 22, 2015 (am)). Jaycox's testimony, although incriminating, had critical weaknesses. On cross-examination, Jaycox conceded that he had originally told IRS agents that Sherri had prepared his 2012 return without mentioning Andre's involvement. Jaycox explained that this was an oversight. "Sherri prepared [his] taxes for years," *id.* at 52, but one year, he now recalled, Andre met with him first and then Sherri had come over to "go back over [his taxes], finaliz[ing] them," *id.* at 47. Although he could not independently remember which particular year this was, he concluded that it was 2013 based on seeing Andre's name on the bottom of his 2012 tax return. Jaycox added another caveat on redirect examination: When the prosecutor asked whether he could remember "seeing" Andre "put numbers into a computer while preparing a tax return for [him]," Jaycox testified that he could not. *Id.* at 79. He could remember only "a young man preparing a return for [him]," and admitted that "[he] wouldn't know Andre Davis if [he] bumped into him on the street." *Id.*

Jaycox's testimony on cross- and redirect examination thus undercut the initial impression left by his testimony on direct examination about Andre's involvement in preparing his 2012 tax return. Although Jaycox did testify that he recalled that a young man had prepared his taxes one year and a reasonable

jury could find that Andre was the "young man" who prepared Jaycox's 2012 income tax return based on Andre's electronic signature on the return and the lack of any evidence of any other young man preparing returns for Sherri at the time, Jaycox invariably limited Andre's role. When asked if he recalled seeing Andre put numbers into a computer while preparing a tax return for him, Jaycox said he did not. As to who was putting information on the return, Jaycox drew a sharp distinction. He testified that "both of them" put information on the return: "The initial portion of it was taken care of by the young man, and then later Sherri came in and finished everything else out." *Id.* at 80. In sum, his testimony dovetailed with LaDonna's description of how Sherri operated her tax preparation business. Sherri would enter numbers in a return that was open on LaDonna's computer and the return would identify LaDonna as the preparer of the return even though Sherri had entered the false information. As Jaycox put it, "[t]he way the process went every year, Sherri would finalize the taxes." *Id.* at 47.

In granting Andre's motion for a judgment of acquittal on Count 15 at the close of the evidence, the district court found that there was insufficient evidence against Andre for that count to be presented to the jury because

> all we really have is [the witness] said she saw him [Andre] do something on a computer. She doesn't know who circled the word "refund." She doesn't have any information that she's testified to about any preparation he did on the return except he handed it to her. Her returns had always been done by Ms. Davis. She had talked to Ms. Davis on the phone and was told to pick it up from Andre. Even construing that along with the EFIN number, his number had been used in his name to file the return, I still think that's all speculation that he willfully and intentionally provided

> false information or provided assistance to intentionally file a fraudulent return.

Trial Tr. 15 (Jan. 28, 2015). The evidence about Andre's role in preparing Jaycox's 2012 tax return, Count 19, is similarly deficient. Even though Jaycox testified that the young man prepared his 2012 income tax return, this statement was "bookended" by the limitations Jaycox referred to on cross- and redirect examination. Sherri had always prepared Jaycox's returns, and even the year the "young man" helped in the preparation, he did only "[t]he initial portion of it[,] . . . and then later Sherri came in and finished everything else out" on the return. Trial Tr. 80 (Jan. 22, 2015 (am)). In view of the overwhelming evidence of Sherri's culpability in the conspiracy generally, and specifically in "finaliz[ing]," *id.* at 47, and "finish[ing]," *id.* at 80, Jaycox's 2012 taxes, that Sherri was the source of any false information is "an equally plausible if not more plausible account than the government's theory" that Andre entered the false information, *United States v. Wilson*, 160 F.3d 732, 738 (D.C. Cir. 1998). Of course, "the government cannot prevail on the basis of jury speculation," *id.*; *see Cooper v. United States*, 218 F.2d 39, 41–42 (D.C. Cir. 1954), and, here, its theory, and the jury's verdict as to Andre on Count 19, was based on speculation. Although the government may meet its burden of proof by circumstantial as well as direct evidence, it does not do so where the evidence is "equivocal." *Direct Sales Co.*, 319 U.S. at 714.

Absent any other evidence of Andre's *mens rea*, the evidence likewise left a critical void and was insufficient to demonstrate that Andre knowingly joined Sherri's conspiracy to defraud the United States under Count 1. Although the government might have been able to show that Andre's intent to conspire could be inferred because he was working for a business that was devoted to filing false returns and he was a

smart man who had to know what his mother was up to, that is not how the government chose to try its case. The government, instead, presented testimony from individual tax payers. It showed that Andre was involved in the preparation of income tax returns for Davis Financial Services. But no witness testified that Andre entered false information on a client's income tax return. Rather, the government's key witness to the conspiracy, LaDonna, and its key witness to Andre's preparation and filing a false return, Jaycox, insisted that Sherri "finalized" the taxes. To the extent the evidence indicated 2FT's purpose was to file false tax returns, that did not necessarily carry over to Davis Financial Services. But even if a reasonable jury could find based on the false statements in Jaycox's 2012 return that a fraudulent purpose continued, and that Andre submitted the EFIN application and received payment for preparing tax returns, the evidence never established beyond a reasonable doubt that he entered false information on any returns or that he knew about or intended that anyone working for Davis Financial Services would do so. Although an unqualified and specific warning from LaDonna might have been enough to alert Andre to steer clear of his mother's criminal conduct, her testimony did not reveal a warning of that nature; instead LaDonna testified that the Davis family blamed her for the client audits and thought the IRS investigation would end shortly. It was the government's burden to establish Andre's intent to defraud, yet the cumulative evidence left the jury to speculate about whether Andre knowingly joined his mother's conspiracy to defraud the United States. And, as shown, filling evidentiary gaps during closing argument to the jury is not an option that is available to the government. *See* Part II.A, *supra*.

In sum, the evidence failed to establish, beyond a reasonable doubt, that Andre knowingly defrauded the United States or knowingly assisted in the preparation and filing of a

false tax return.

### III.

Sherri challenges her convictions on the grounds of prosecutorial misconduct during closing argument and evidentiary error by the district court. Although these challenges fail, we conclude that her challenges to her sentence and trial counsel's assistance require further consideration by the district court.

### A.

In his final statement during rebuttal closing argument to the jury, the prosecutor told the jury that "Sherri Davis is not going to stop until somebody tells her to stop. Your job is to tell her to stop." Trial Tr. 177 (Jan. 28, 2015). Because Sherri raised her objection that this statement constituted prosecutorial misconduct in moving for a new trial, our review is for abuse of discretion, *see United States v. Vega*, 826 F.3d 514, 529 (D.C. Cir. 2016), and we find none.

"It is well established that a prosecutor may not make statements calculated to arouse the passions or prejudices of the jury," *United States v. Monaghan*, 741 F.2d 1434, 1440 (D.C. Cir. 1984), or "urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking," *id.* at 1441. As the last words to the jury, the potential for prejudice from an impermissible closing statement is heightened. *See United States v. Holmes*, 413 F.3d 770, 776 (8th Cir. 2005) (citing cases).

The district court reasonably concluded that the prejudice caused by the misconduct was sufficiently mitigated. Before it commenced deliberating, the jury was instructed to "ignore that last comment of government counsel." Trial Tr. 182 (Jan. 28,

2015).  Sherri suggests this instruction may have done more harm than good by bringing attention to the misstatement.  This type of "speculative assumption[]" is reasonably rejected, *see Lakeside v. Oregon*, 435 U.S. 333, 340 (1978), particularly in light of her counsel's request for a curative instruction.  Additionally, the evidence against Sherri was overwhelming, *see supra* Part I, and Sherri understandably does not challenge her convictions on the ground of insufficient evidence, *see* Reply Br. 28.  Further, the prosecutor's errant statement neither bolstered nor discredited any witness testimony, nor concerned a critical issue for which there was no evidence.  *Cf. United States v. Kerr*, 981 F.2d 1050, 1053–54 (9th Cir. 1991).

**B.**

Sherri's contention that the district court erred in excluding the testimony of her expert medical witness fares no better.  Under the Insanity Defense Reform Act of 1984, 18 U.S.C. §§ 17, 4241 *et seq.*, mental condition evidence is admissible if "adequately keyed to the issue of whether [the defendant] entertained the *mens rea* required for proof of the crime." *United States v. Childress*, 58 F.3d 693, 729 (D.C. Cir. 1995).  "Thus, 'the proper focus is on the proffered link or relationship between the specific psychiatric evidence offered and the *mens rea* at issue in the case.'"  *Id.* at 730 (quoting *United States v. Cameron*, 907 F.2d 1051, 1067 n.31 (11th Cir. 1990)) (brackets omitted).  The district court granted the government's *in limine* motion to strike her medical expert's testimony, finding that it lacked a link to the issue of Sherri's *mens rea.*  The court also concluded that the expert's proffer that attention deficit hyperactivity disorder ("ADHD") "could cause Ms. Davis to have difficulty completing tasks and accurately filling out detailed forms[] . . . is precisely the type of 'justification or excuse' evidence that is not permitted because of the danger that it will mislead the jury." *United States v. Davis*, 78 F. Supp. 3d 17, 21 (D.D.C. 2015).  Our review is for abuse of discretion, *see United States v. Day*, 524 F.3d 1361, 1369 (D.C. Cir. 2008);

*United States v. Long*, 328 F.3d 655, 662 (D.C. Cir. 2003), and we find none.

At a pretrial evidentiary hearing, Dr. Robert Madsen, a forensic psychiatrist, testified that Sherri suffered from ADHD, and that people with this disorder are easily distracted and error-prone. This condition, he opined, would not cause a person to make up numbers out of whole cloth as Sherri was accused of doing, although, he observed, people with ADHD "often are prevaricators" or "liars." Pre-Trial H'g Tr. 41 (Dec. 10, 2014). The district court reasonably concluded that allowing Dr. Madsen's testimony would, in effect, "open[] up the jury to theories of defense more akin to justification," without offering any insight into Sherri's *mens rea*. *Childress*, 58 F.3d at 729 (quoting *United States v. Pohlot*, 827 F.2d 889, 905 (3d Cir. 1987)).

## C.

Sherri's contention that the district court erred in denying her motion for a new trial based on a violation of *Brady v. Maryland*, 373 U.S. 83 (1963), is also unpersuasive. Under *Brady* and its progeny, the government must timely disclose exculpatory or impeachment evidence to the defendant. *Brady*, 373 U.S. at 87; *Strickler v. Greene*, 527 U.S. 263, 280–82 (1999); *see United States v. Straker*, 800 F.3d 570, 603 (D.C. Cir. 2015). Reversal of a conviction is warranted when "the [withheld] evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *United States v. Bagley*, 473 U.S. 667, 678 (1985). This court "defer[s]" to the district court's factual findings "under an abuse of discretion standard" but reviews the question of materiality and prejudice *de novo*. *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007); *accord Straker*, 800 F.3d at 603; *United States v. Moore*, 651 F.3d 30, 99 (D.C. Cir. 2011). Here, we conclude there is no "reasonable probability that the suppressed evidence would have produced a different verdict" for Sherri.

*Strickler*, 527 U.S. at 281.

Sherri's focus is on the pre-trial admission by LaDonna that she filed individual tax returns falsely claiming dependents. Sherri maintains that this undisclosed information would have helped cast LaDonna as the mastermind of the tax fraud conspiracy and diminished her credibility. Even assuming the evidence would have assisted Sherri in showing LaDonna was the "mastermind," it would not detract from the evidence of Sherri's major role in the conspiracy and the related criminal conduct. The taxpayer witnesses identified Sherri as preparing and being directly involved in preparing their false returns; this remained true even after LaDonna withdrew from the conspiracy. The impeachment value of the evidence that LaDonna had knowingly filed five false individual tax returns was cumulative to LaDonna's admission at trial that she had prepared and filed years of false income tax returns on behalf of 2FT clients. *See United States v. Brodie*, 524 F.3d 259, 269 (D.C. Cir. 2008); *United States v. Cuffie*, 80 F.3d 514, 517–18 (D.C. Cir. 1996). It is improbable that LaDonna's credibility "would have been further diminished" by the "new" evidence. *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016). Sherri suggests that the evidence would have allowed her to attack LaDonna's "noncompliance with the truthtelling provisions of her cooperation agreement." Appellant Br. 33. But the record indicates that LaDonna's statements to IRS agents about her own tax returns predated the cooperation agreement. LaDonna's later admissions about her own falsified returns showed she was more forthcoming after entering into the plea bargain.

## D.

Sherri challenges the loss and restitution calculations underlying her sentence. The court reviews sentencing decisions for abuse of discretion, *see Gall v. United States*, 552 U.S. 38, 46 (2007); *United States v. Pole*, 741 F.3d 120, 127

(D.C. Cir. 2013), and factual findings for clear error, *see id.*; *United States v. Brockenborrugh*, 575 F.3d 726, 738 (D.C. Cir. 2009); *United States v. Leonzo*, 50 F.3d 1086, 1088 (D.C. Cir. 1995). We conclude a remand for resentencing is required.

The district court estimated a tax loss attributable to Sherri of more than $1.4 million, including a $642,103 loss to the federal government that was subject to restitution, and a nearly $800,000 loss to the District of Columbia. Sherri challenges the reliability and sufficiency of the facts underlying both figures. The government only defends the federal loss figures on the assumption that this court need not reach Sherri's challenge to the District of Columbia tax loss because the federal tax loss exceeded $550,000, the minimum loss necessary to reach Sherri's Sentencing Guidelines' base offense level of 20. *See* U.S.S.G. § 2T4.1. Sherri, however, challenged both loss figures in the district court and on appeal. Because her challenge to the federal loss calculation is compelling, the district court should address both on remand.

The government presented two charts purporting to document the federal tax loss. On appeal, the government explains that one was an earlier draft of the other and was inadvertently included in the government's sentencing memorandum to the district court. *See* Amended Letter of February 3, 2017, from David A. Hubbert, Acting Assistant Attorney General, to Mark J. Langer, Clerk of the Court. The charts are largely identical except for a column in the draft "Description of Determination." (The draft also includes losses for taxpayer Neda Graves that are omitted from the final chart, so the total numbers vary modestly.) In the "Description of Determination" column, losses are labeled with descriptors such as "based on MOI" (memorandum of interview), "based on preparer pattern," "audit amount," and "per DOJ instructions." A note as to a loss of $11,866 states "$1,668 potential audit, unsure what this is." Although this could be a typographical

error, the $11,866 figure, like all the other loss figures in the draft chart, are in the final chart minus the explanatory text.

At the sentencing hearing, the district court acknowledged that the government would need to "produce some evidence" of what the descriptions in the draft chart on federal tax losses meant or the court would be at "a loss" trying to determine the means used and accuracy of the claims. Sent. H'g Tr. 11 (July 16, 2015 (am)). The testimony by the government's expert, IRS Special Agent Naim, was incomplete, however, because he had not prepared either chart and could only surmise the meaning of the labels in the draft chart, conceding that "if it says based on preparer pattern, the logical inference of that is that it was not based on a memorandum of interview because it doesn't say memorandum of interview[.]" *Id.* at 44. Special Agent Naim also could not confirm that the government had interviewed the individuals about every year that was described as "based on MOI" in the draft chart. He had interviewed one taxpayer, Carlos Little, about only his 2012 return, yet the chart listed three years of data as "based on MOI." The prosecutor claimed that Little's grand jury testimony could have been the source of the information and that "[a]ll the rest of the witnesses . . . were interviewed, personally spoken to by someone from the IRS, and/or personally testified here at trial." Sent. H'g Tr. 23 (July 16, 2015 (pm)).

The district court concluded that the government presented "essentially an accurate recitation of the losses," *id*. at 39, by assuming that if the loss figures were not supported by an MOI, then they "came from the files of the IRS and from the testimony that [the taxpayers] had proffered either at trial or in grand jury or through the evidence from their returns that . . . the government had," *id*. at 38. Although a sentencing court need only find facts by a preponderance of evidence, that evidence must have a "sufficient indicia of reliability to support its probable accuracy." *United States v. Fahnbulleh*, 752 F.3d

470, 481 (D.C. Cir. 2014) (quoting *United States v. Bras*, 483 F.3d 103, 109 (D.C. Cir. 2007)). Here, the defendants identified numerous inconsistencies in the government's evidence that cast doubt on the reliability of the information presented to the district court. The discrepancy between Special Agent Naim's testimony that the final chart was based on personal interviews and audits and the broader array of sources identified in the draft chart and suggested by the prosecutor requires further explanation. "[S]entences under the Guidelines 'must be supported by reasons,' and that means 'something more than conclusions — a distinction important not only to the defendant whose future is at stake but also to the appellate process.'" *United States v. McCants*, 434 F.3d 557, 562 (D.C. Cir. 2006) (quoting *Childress*, 58 F.3d at 723).

Nor is it clear that any error was harmless. Because the data in the final chart appears unreliable as a whole, and not just as to a few specific individual taxpayers, the court cannot be confident that the government could prove more than the $325,000 of loss that Sherri conceded, much less enough to reach $550,000 so her base offense level would remain unchanged. *See* U.S.S.B. § 2T4.1. And, although the base offense level is the same whether the loss is $550,000 or $1.4 million, the difference in amount is significant and could affect the district court's evaluation of the "seriousness of the offense" in choosing a specific sentence. 18 U.S.C. § 3553(a)(2)(A).

It is also evident that the district court based its restitution calculation under 18 U.S.C. § 3664(e) on the federal loss findings. *See also* Appellee Br. 66. Because the district court must resolve factual disputes over restitution with "something more than conclusions," *Pole*, 741 F.3d at 128 (quoting *McCants*, 434 F.3d at 562), the restitution order is riddled with the same problems as the loss figures. We vacate Sherri's sentences and remand for resentencing on loss and restitution.

**E.**

To prove ineffective assistance of counsel, a defendant must show both that "counsel's representation fell below an objective standard of reasonableness," *Strickland v. Washington*, 466 U.S. 668, 688 (1984), and "that counsel's errors were so serious as to deprive the defendant of a fair trial," *id.* at 687. "[U]nless the record alone conclusively shows that the defendant either is or is not entitled to relief[,]" the court will remand any "colorable claim" for further fact-finding. *United States v. Mohammed*, 693 F.3d 192, 202 (D.C. Cir. 2012) (internal quotation marks omitted).

Sherri contends that she was denied the effective assistance of counsel because trial counsel failed (1) to introduce into evidence the undercover videotapes of LaDonna preparing false tax returns for IRS agents; (2) to introduce a Facebook post by a taxpayer witness referencing business endeavors that purportedly suggest the claimed expenses on his returns were not false or, at least, that Sherri was unaware they were false; and (3) to request a mistrial following the prosecutor's closing argument and to consult with her about making that request. Because the record does not conclusively demonstrate that Sherri is not entitled to relief, "further factual development" is necessary. *United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013). Although trial counsel moved for a new trial on the ground that the prosecutor's argument was prejudicial and we affirm the district court's denial of the motion, the district court should address Sherri's third objection as well because our review was limited to determining whether the district court abused its discretion, not whether Sherri has demonstrated denial of her Sixth Amendment right to effective counsel.

Accordingly, we reverse the judgment of conviction of Andre Davis on Counts 1 and 19, and we affirm the judgment of conviction of Sherri Davis, but vacate her sentence and remand her case for resentencing and for consideration of her

claims of ineffective assistance of counsel.