# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued November 6, 2013      Decided December 20, 2013

No. 12-3031

UNITED STATES OF AMERICA,
APPELLEE

v.

NGOZI POLE,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00354-1)

*Beverly G. Dyer*, Assistant Federal Public Defender, argued the cause for appellant. With her on the briefs was *A. J. Kramer*, Federal Public Defender. *Tony Axam Jr.*, Assistant Federal Public Defender, entered an appearance.

*Sonja M. Ralston*, Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief were *Mythili Raman*, Acting Assistant Attorney General, and *Tracee Plowell*, Trial Attorney.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Imagine that you oversee the budget of a large Senate office, and you're in a bind. Your boss, the Senator, has directed you to ensure that the budget is spent to zero every fiscal year, but the fiscal year is nearing its end, the office is on track to run a significant surplus, and the chief of staff seems unwilling to focus on the problem. How should you handle the situation? Appellant, who lived this hypothetical while serving as former Senator Edward M. Kennedy's office manager, made the wrong choice. In an effort to spend down surpluses and simultaneously compensate hard work, Appellant awarded himself large unauthorized bonuses. For his efforts, he was convicted of five counts of wire fraud and one count of theft. On appeal, he argues that the district court wrongly excluded evidence, that he received ineffective assistance of trial counsel, and that the district court's restitution order was excessive. Although we reject Appellant's evidentiary arguments, we remand his colorable ineffective assistance claims and vacate and remand the restitution order because neither the jury nor the district court made factual findings sufficient to support the order.

## I.

Appellant Ngozi Pole began serving as Senator Edward M. Kennedy's Washington, D.C. office manager in 1998 and remained in that position until 2007. During that time, Pole served under four chiefs of staff—Gerard Kavanaugh, Mary Beth Cahill, Danica Petroshius, and Eric Mogilnicki—and one interim chief of staff. Despite the government's claim that "Pole [m]anaged the [o]ffice, [n]ot the [b]udget," Appellee's Br. 3, his role as office manager went far beyond ensuring that Senator Kennedy's staff had an adequate supply of pencils. As part of his human resources portfolio, Pole was responsible for submitting "payroll action authorization" forms (PAAs), which raised or lowered the salaries of office employees. According to

the government, Pole needed approval from Kennedy or the chief of staff for any salary adjustments, but neither the Senator nor the chiefs of staff regularly reviewed PAAs prior to submission. As part of his budget portfolio, Pole served as the office's point of contact for the Senate Disbursing Office, which sent periodic updates about how much money the office had left to spend. Because Senator Kennedy wanted the office to spend every last cent every fiscal year, Pole was responsible for keeping track of how much money remained and for making recommendations about how to reach the magic zero-balance point.

Near the end of fiscal year 2001, the office was in danger of running a significant deficit. Though the office ultimately ended the year in the black, the deficit scare led Cahill, then chief of staff, to spend frugally in fiscal year 2002 even though the office also received an increased budget allocation that year. This combination of frugality and increased funds led to a surplus at the end of fiscal year 2002.

With the office on track to run another surplus in fiscal year 2003, Pole devised a plan to spend down the budget and make a little something for himself. His plan took advantage of a Kennedy office practice, condoned by the Senator and chiefs of staff, designed to circumvent an official Senate ban on employee bonuses. In order to award annual bonuses notwithstanding the ban, Kennedy's office would, with the Senator's or the chief of staff's approval, submit PAAs that increased an employee's salary for a period of time—two or three weeks or even a month—sufficient to produce the intended bonus. In order to award exit bonuses, the office took two approaches: employees targeted for bonuses were kept on the payroll either for a few weeks following their departure or for an indefinite period at a salary just high enough to cover the employee contribution for Senate-subsidized health care. Pole used his role in the PAA

4

submission process to grant various staffers—most notably himself—bonuses that neither the Senator nor the chief of staff authorized. Pole continued awarding these bonuses until January 2007 when he gave himself an exit bonus before leaving to take a new position as Senator Sherrod Brown's deputy chief of staff. In total, Pole awarded himself $77,608.86 in unapproved bonuses.

After Pole casually mentioned his exit bonus to Mogilnicki, chief of staff at the time, Mogilnicki became suspicious and requested all payroll records for all employees. Realizing the extent of Pole's scheme, Mogilnicki contacted Gregory Craig, former senior aide and counselor to Senator Kennedy. Together they confronted Pole. According to Craig, Pole defended his actions, claiming that he had been denied raises he "felt he had been entitled to" and could have earned more in the private sector. Trial Tr. 58 (Jan. 25, 2011) (testimony of Gregory Craig). Craig and Mogilnicki referred the matter to the FBI, and Senator Brown dismissed Pole.

Following the FBI investigation, Pole was charged with five counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of theft of government property worth more than $1,000 in violation of 18 U.S.C. § 641. Although the indictment alleged a scheme to defraud dating from July 2003, the five-year statute of limitations prevented the government from charging fraud for wire transfers occurring prior to December 15, 2004. At trial, the basic dispute was over whether Pole knew he needed authorization to award bonuses. Given Senator Kennedy's instruction to spend the budget to zero and the absence of clear rules and procedures, Pole maintained that he had implicit authority to spend down the budget however he saw fit. Contesting this account, the government leaned on Pole's own statements, as well as testimony from all five chiefs of staff, indicating that Pole knew that he needed approval for salary

adjustments. After the jury convicted Pole on all charges, the district court sentenced him to twenty months in prison and ordered him to pay $75,042.37 in restitution (the full $77,608.86 the government asserts he stole minus some $2,500 that Mogilnicki managed to recover through the Senate Disbursing Office).

On appeal, Pole challenges three evidentiary rulings, argues that he received ineffective assistance of counsel, and insists that the district court miscalculated restitution. We consider each issue in turn.

## II.

We begin with Pole's argument that the district court wrongly excluded three pieces of testimonial evidence. When a defendant has preserved his objection to a district court's evidentiary ruling, we review that ruling for abuse of discretion. *United States v. Alexander*, 331 F.3d 116, 121 (D.C. Cir. 2003). We review unpreserved objections for plain error. *United States v. Thompson*, 279 F.3d 1043, 1048–49 (D.C. Cir. 2002). Either way, if we determine that the district court has erred in excluding particular evidence, we will reverse the conviction on that basis only if the error was not harmless. *United States v. Baugham*, 449 F.3d 167, 183 (D.C. Cir. 2006) (plain error); *United States v. Coumaris*, 399 F.3d 343, 347–50 (D.C. Cir. 2005) (abuse of discretion).

Pole first challenges the district court's refusal to permit him to testify about the contents of certain budget memos. The issue arose when Pole testified that he "let Ms. Cahill know that the surplus numbers were high [in fiscal year 2002]." Trial Tr. 67 (Jan. 26, 2011 Afternoon Session). Noting that some budget memos he sent Cahill had been entered into evidence, Pole then attempted to testify that the "place where I traditionally would put [the projected surplus] number is redacted so it's hard to

see." *Id*. The government objected, arguing that Pole should not be allowed to testify about redacted contents. Sustaining the objection, the district court stated only that the redacted contents are "not a part of the evidentiary record." *Id.* at 68–69.

Assuming the district court erred in excluding this testimony, and even if, as Pole insists, that error was of "constitutional dimension," "it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *United States v. Powell*, 334 F.3d 42, 45 (D.C. Cir. 2003) (quotation marks omitted). Pole was allowed to testify that he kept chiefs of staff informed about budgetary matters and in fact did testify that he "let Ms. Cahill know that the surplus numbers were high." Thus, if the jury found that Pole generally lacked credibility, it would have had no reason to believe his assertions about what lay under the redactions; if the jury found Pole generally credible, it would have learned nothing new from the excluded testimony. Since any error in excluding this testimony was clearly harmless, we have no need to address the government's dubious assertion that Pole failed to preserve this challenge, *see* Fed. R. Evid. 103(a)(2), or its argument—advanced for the first time on appeal—that Pole's testimony would have violated the Best Evidence Rule, *see* Fed. R. Evid. 1002; *cf. United States v. Davis*, 596 F.3d 852, 858 n.4 (D.C. Cir. 2010) (noting that the government's failure to make a "best evidence objection" at the district court deprived the defendant of an opportunity to demonstrate that a Best Evidence Rule exception applied).

Pole next challenges the district court's refusal to admit testimony from former Financial Clerk of the Senate Kenneth Wineman about a telephone conversation Wineman had with Kennedy. Wineman was prepared to testify that at some undetermined time he and Kennedy discussed the office budget and several payroll matters. According to Wineman, the Senator

indicated that Wineman could pass along follow-up information to Pole for delivery to Kennedy. Questioning the relevance of this testimony, Trial Tr. 150–53 (Jan. 25, 2011), the district court ultimately excluded it because it was duplicative of other evidence and likely to invite speculation. *Id.* at 154–55.

Under Federal Rule of Evidence 403, the district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see also Henderson v. George Washington University*, 449 F.3d 127, 133 (D.C. Cir. 2006) (noting that our review of Rule 403 rulings is highly deferential). According to Pole, Wineman's testimony had significant probative value because it would have: (1) helped demonstrate that "Kennedy's office functioned as an art, not as a science"; (2) "countered government witness testimony that Pole failed to keep the chiefs of staff informed"; and (3) reflected Kennedy's faith in Pole. Appellant's Br. 47–48 (internal quotation marks omitted). But Wineman could not recall when the call occurred, Trial Tr. 161–62 (Jan. 25, 2011), and Pole's counsel indicated that he would not ask Wineman what specifically was discussed or whether he provided any follow-up information to Pole, *id.* at 153–55. Given this, the district court hardly abused its discretion in determining that the limited probative value of the testimony was substantially outweighed by the distraction that might have resulted had the jury been invited to speculate about what Kennedy said to Wineman and what, if anything, Wineman gave Pole to deliver to Kennedy.

Pole also challenges the district court's refusal to allow Wineman to testify about a telephone conversation with Pole that followed his conversation with Kennedy. Wineman was prepared to testify that Pole, after hearing about Wineman's

conversation with Kennedy, indicated that he was "surprised that [Kennedy] wanted to get involved, but certainly we will do whatever he wants us to do." Trial Tr. 166 (Jan. 25, 2011). Doubtful about the relevance of this testimony, the district court ultimately excluded it as inadmissible hearsay. *Id*. at 169.

Pole insists that the testimony would have demonstrated his can-do spirit and willingness to comply with instructions. And perhaps Pole's expression of surprise and willingness to comply would have been probative of his state of mind had he and Wineman discussed some matter relevant to this case. But because Wineman's testimony about the Kennedy call was permissibly excluded, the jury would have had no way of knowing whether Pole's expression of surprise and willingness to comply referred to spending down the budget (clearly relevant), ensuring that PAAs were signed with blue ink (clearly irrelevant), or something in between. Under these circumstances, even if the district court erred in excluding this testimony on hearsay grounds, and even if that error was constitutional in nature, we are confident beyond a reasonable doubt that the error had no effect on the outcome of the trial.

**III.**

Next, Pole maintains that he received ineffective assistance of trial counsel. Specifically, he alleges that trial counsel should have (1) produced unredacted copies of Pole's budget memos; (2) "through documentary evidence and additional discovery or otherwise" demonstrated that "Pole routinely issued exit bonuses without specific chief of staff approval"; (3) "demonstrate[d] that Cahill instructed Pole to spend the budget to zero, or to impeach her testimony that she did not do so"; and (4) attempted to impeach Petroshius by introducing evidence about employee bonuses she denied issuing and by "question[ing] Petroshius regarding a memoranda from Pole"

containing budgetary information she claimed never to have received. Appellant's Br. 53–56.

To prevail on his ineffective assistance of counsel claims, Pole

> must show two things: that his lawyer made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment," and that counsel's deficient performance was prejudicial, *i.e.,* that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*United States v. Gaviria*, 116 F.3d 1498, 1512 (D.C. Cir. 1997) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 694 (1984)). In this Circuit, we generally remand "colorable claim[s]" of ineffective assistance to the district court to make any necessary factual findings, *United States v. Moore*, 651 F.3d 30, 85, 87 (D.C. Cir. 2011), "unless the record conclusively demonstrates that the defendant is or is not entitled to relief," *United States v. Fareri*, 712 F.3d 593, 595 (D.C. Cir. 2013) (internal quotation marks omitted). "We do not reflexively remand, but neither will we hesitate to remand when a trial record is insufficient to assess the full circumstances and rationales informing the strategic decisions of trial counsel." *United States v. Mohammed*, 693 F.3d 192, 202 (D.C. Cir. 2012) (internal citations and quotation marks omitted).

Here, Pole has alleged errors that, taken together, qualify as "colorable," requiring remand under this forgiving standard. Had Pole's counsel introduced unredacted memos demonstrating that Pole kept Cahill informed about surpluses, the jury might have found Pole a more credible witness. Had Pole's counsel been able to demonstrate that Pole had authority

to issue exit bonuses without prior approval, Pole might have avoided conviction on the wire fraud count arising from his exit bonus and even convinced the jury that he reasonably believed he had authority to award himself unapproved annual bonuses. Had Pole's counsel successfully impeached Cahill and Petroshius, Pole might have undermined their testimony that he needed their approval before making salary adjustments.

To be clear, we conclude only that Pole's claims of ineffective assistance are colorable, not that he has likely demonstrated ineffective assistance. Indeed, the government offers several plausible arguments suggesting that Pole has shown neither error nor prejudice. But given Pole's allegations, and given that the trial record neither indicates why trial counsel made particular strategic decisions nor refutes the possibility that Pole suffered prejudice, we believe that the safest course of action is to allow the district court to address the claims—and the government's responses—in the first instance. We leave it to the wise judgment of the district court to decide whether to hold an evidentiary hearing.

## IV.

Finally, Pole argues that the district court improperly inflated the amount of restitution he owes. Relying on the presentence report, the district court ordered Pole to pay the government $75,042.37, Pole's total gains from all unauthorized bonuses he awarded himself minus the small amount Mogilnicki managed to recover. According to Pole, he should have been required to pay back only $11,233.24, the total gains from the five unauthorized bonuses underlying the counts of conviction minus what Mogilnicki recovered. We review restitution orders for abuse of discretion and any factual findings underlying those orders for clear error. *United States v. Bryson*, 485 F.3d 1205, 1208 (D.C. Cir. 2007).

11

In their briefs, the parties primarily debate whether, under the Mandatory Victim Restitution Act, 18 U.S.C. § 3663A, courts can order restitution for all losses resulting from a scheme to defraud, where, as here, some of those losses occurred outside the statute of limitations. But we need not address this question because the restitution order in this case suffers from a more fundamental defect. Even though record evidence might have supported a scheme to defraud extending to conduct outside the statute of limitations, nothing in the record supports the government's assertion that the jury or district judge actually found a scheme of such duration.

As for the jury, neither the court's instructions nor the verdict form indicates that the jury found a scheme to defraud that included conduct outside the statute of limitations. The instructions stated that "[i]t is not necessary that the government prove all of the details alleged concerning the precise nature and purpose of the scheme." Final Jury Instructions 20. Even though the instructions went on to state that "[w]hat must be proved . . . [is] a scheme to defraud substantially the same as the one alleged in the indictment," *id.*, Pole asserts, without contradiction, that the jury received an edited version of the indictment that included no references to pre-statute of limitations conduct. Moreover, the verdict form listed five counts of wire fraud and asked the jury to determine for each whether "*[o]n or about [the date of a charged wire transfer] . . .* defendant executed and attempted to execute the scheme and artifice to defraud." Verdict Form 1–3 (emphasis added). Nothing in this language suggests that in returning a verdict of guilty the jury necessarily found a scheme to defraud predating the earliest charged wire transfer. As a result, the jury's decision to convict Pole provides no factual basis for the restitution order.

As for the district court, because it failed to make any factual findings regarding the duration of the scheme, we have no occasion to consider whether, under *Apprendi v. New Jersey*, 530 U.S. 466 (2000), a jury must find the facts justifying the restitution amount, or whether the jury's verdict on the offense of conviction authorizes the district court to impose—in accordance with statutory requirements—an amount of restitution justified by its own findings. *Cf. Bryson*, 485 F.3d at 1208 ("The Government must prove at sentencing that its proposed restitution figure is supported by a preponderance of the evidence." (citing 18 U.S.C. § 3664(e)). As Pole's counsel sought to point out at sentencing, *see* Trial Tr. 76 (Mar. 30, 2012), this Court has interpreted Federal Rule of Criminal Procedure 32(i)(3)(B) to require the district court, at a minimum, to make specific factual findings resolving any "disputed portion of the presentence report or other controverted matter." Fed. R. Crim. P. 32(i)(3)(B); *see also United States v. McCants*, 434 F.3d 557, 561–62 (D.C. Cir. 2006). To satisfy this requirement, the district court must provide "something more than conclusions." *Id.* at 562 (internal quotation marks omitted). "The fact-finding requirement serves more than the purely ministerial function of transmitting accurate information to the Bureau of Prisons and Parole Commission; more importantly, it protects a defendant's due process rights to be sentenced on the basis of accurate information, and facilitates appellate review by furnishing a clear record of the resolution of disputed facts." *Id.* at 561–62 (internal quotation marks omitted).

Here, Pole clearly contested the duration of the scheme. *See, e.g.*, Defendant's Surreply to the Government's Sentencing Memorandum at 24–25, 29–30. But without resolving this factual dispute, the district court adopted the presentence report's recommendation:

> I was the trial judge. I heard from Day One to the end of this trial, I heard all the testimony and there's nothing inconsistent with the evidence adduced at trial in the presentence report, and the Court firmly believes that what's set forth in those paragraphs is indeed the factual predicate necessary for the Court to find as a matter of fact the amount of . . . restitution.

Trial Tr. 3/30/12 at 76–77. In our view, this statement is too conclusory to satisfy the requirements of Rule 32(i)(3)(B), as nothing in it resolves the factual assertions Pole raised. Thus, even if the district court could have constitutionally imposed restitution on the basis of its own findings (by a preponderance of the evidence) that the scheme to defraud included conduct outside the statute of limitations, it failed to do so.

The government argues that vacating the restitution order would conflict with the approach taken in other circuits, which have held that "restitution may be ordered for all losses caused by a scheme and that the scheme's scope encompasses at least what is outlined in the charging document." Appellee's Br. 45. In support, however, the government cites only cases where courts upheld restitution orders that, unlike here, rested on adequate findings, *see, e.g.*, *United States v. Brown*, 665 F.3d 1239, 1253 (11th Cir. 2011) (upholding a restitution order because district court fact-finding provided an adequate factual basis), or vacated restitution orders that, as here, suffered from factual or legal defects, *see, e.g.*, *United States v. Adams*, 363 F.3d 363, 366–68 (5th Cir. 2004) (vacating a restitution order because it was inconsistent with the "mutual understanding of the parties"). Moreover, insisting that restitution orders have an adequate factual basis imposes no significant limitation on restitution. The government can always ask the district court to craft a verdict form that ensures the jury is able to make factual findings sufficient to support a particular amount of restitution,

or, assuming no *Apprendi* problem, urge the court to resolve factual disputes at sentencing instead of simply relying on the presentence report.

## V.

For the foregoing reasons, we reject Pole's evidentiary challenges, remand Pole's ineffective assistance claims, and vacate and remand the restitution order for further proceedings consistent with this opinion.

*So ordered.*