# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued March 19, 2025         Decided August 29, 2025

No. 24-3029

UNITED STATES OF AMERICA,
APPELLEE

v.

NGOZI POLE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:09-cr-00354-1)

———

*Elana M. Stern*, appointed by the court, argued the cause for appellant.  With her on the briefs were *Brian Blais* and *Peter M. Brody*, appointed by the court.

*Javier A. Sinha*, Attorney, U.S. Department of Justice, argued the cause for appellee.  With him on the briefs were *Kevin Driscoll*, Deputy Assistant Attorney General, *Blake J. Ellison*, Trial Attorney, *Brent S. Wible*, Principal Deputy Assistant Attorney General, and *Lisa H. Miller*, Deputy Assistant Attorney General.  *Scott A. Meisler*, Attorney, entered an appearance.

2

Before: SRINIVASAN, *Chief Judge*, WILKINS, *Circuit Judge*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Chief Judge* SRINIVASAN.

SRINIVASAN, *Chief Judge*:   This case comes before us a second time.  After appellant Ngozi Pole was convicted of multiple counts of wire fraud and one count of theft of government property, he appealed to our court.  We rejected Pole's challenges except that we:  (a) remanded to the district court to consider Pole's claim that he had received ineffective assistance of trial counsel, and (b) vacated the district court's order of restitution as unsupported by factual findings. *United States v. Pole*, 741 F.3d 120 (D.C. Cir. 2013) (*Pole I*).

On remand, the district court rejected Pole's ineffective-assistance claim in light of the relative insignificance of the asserted counsel errors and the weight of the evidence of guilt. The court also made factual findings concerning restitution and reinstituted the award.  Pole now appeals both the rejection of his ineffective-assistance claim and the reimposition of the restitution order.  We affirm the district court.

I.

A.

We briefly summarize the case's factual background, which is fully laid out in our previous opinion. *See Pole I*, 741 F.3d at 123–24.  Pole worked in Senator Edward Kennedy's office from 1998 to 2007.  In his role as office manager, he oversaw the office's budget and handled the bonuses issued to staff.

From 2003 to 2007, Pole awarded himself substantial bonuses without authorization from the Senator or his chief of staff. That went unnoticed until late 2006, when Pole asked the Senator's chief of staff at the time, Eric Mogilnicki, to approve a departure bonus for Pole before he left the office for another position. Mogilnicki told Pole he would consider it, but Pole went ahead and awarded himself the bonus.

After learning of Pole's departure bonus and investigating further, Mogilnicki and another person who had previously served on Senator Kennedy's staff, Gregory Craig, met with Pole. Mogilnicki and Craig asked Pole about the series of bonuses he had awarded himself and related discrepancies in the office's payroll records. Pole gave multiple explanations, none of which convinced Mogilnicki and Craig. After the meeting, Craig and Mogilnicki contacted the FBI. The ensuing investigation led to Pole's being charged with five counts of wire fraud and one count of theft of government property.

## B.

Over the course of the three-week trial, the prosecution elicited the testimony of each of the five chiefs of staff under whom Pole served. The "basic dispute was over whether Pole knew he needed authorization to award bonuses." *Pole I*, 741 F.3d at 124.

Like other chiefs of staff, Mogilnicki testified that Pole lacked authority to issue bonuses without the chief of staff's approval. In the course of his testimony, Mogilnicki at one point spoke about his and Craig's meeting with Pole. On that topic, Mogilnicki said (among other things) the following:

> There came a time in that conversation when [Pole] offered to try to pay the money back. He said, "If that's

what it takes to, you know, to get this behind me, I'll see if I can—if I can pay the money back . . . . You know, that was when I lost my last hope that this wasn't what it seemed to be. I—you know, I went to the meeting thinking maybe there was an explanation, but that sort of—that was the—that was sort of the last straw in my mind as to whether he had actually taken the money or not. I couldn't imagine someone who had an honest right to that money would offer to pay it back. That didn't make sense.

Trial Tr. 104–05, Jan. 19, 2011, Dkt. No. 82 (J.A. 550–51).

Craig also testified about the meeting, echoing Mogilnicki's testimony that Pole had admitted during the meeting that "those bonuses had not been authorized." Trial Tr. 46, Jan. 25, 2011, Dkt. No. 86 (J.A. 1427); *see also id.* at 53, 60 (J.A. 1434, 1441). And Craig, like Mogilnicki, said that Pole expressed frustration with his salary and claimed that he could have been making "much more money" in the private sector. *Id.* at 58 (J.A. 1439).

Following Pole's presentation of his defense case, the parties made their closing arguments to the jury. The government's closing argument began as follows:

I, Ngozi Pole, do solemnly swear or affirm that I will support and defend the Constitution of the United States against all enemies, foreign and domestic . . . and that I will well and faithfully discharge the duties of the office on which I am about to enter, so help me God. That's the oath that the Defendant himself took in August 2000, . . . "to well and faithfully discharge the duties as office manager for Senator Edward M. Kennedy." And for the last couple of weeks, ladies and gentlemen, you have seen and you've heard the evidence that the Defendant

violated that oath time and time again to satisfy not the Senator's needs but his own greed.

Trial Tr. 8, Jan. 31, 2011, Dkt. No. 121 (J.A. 1928). The government's closing went on for an additional 20 pages in the trial transcript, never again referencing the oath.

The jury returned a verdict of guilty on all counts. The court sentenced Pole to 20 months of imprisonment and ordered him to pay $75,042.37 in restitution, which was the overall amount of the eight bonuses Pole had awarded himself from 2003 to 2007 minus a small sum that Mogilnicki had been able to claw back.

Pole appealed his conviction and sentence. *See Pole I*, 741 F.3d at 123, 127. Though we rejected most of Pole's challenges, we remanded for the district court to consider Pole's claim of ineffective assistance of counsel in the first instance, and we vacated the restitution order because it was unsupported by adequate factual findings. *Id*. at 126–28.

C.

On remand, the district court held a hearing on Pole's ineffective-assistance claim. As relevant here, the court considered trial counsel's decisions not to object to (a) Mogilnicki's testimony about Pole's offer to pay back the bonus amounts or (b) the prosecution's reference to Pole's oath of office in its closing argument. The court concluded that even if counsel's failures to object were erroneous, there was no prejudice given the weight of the evidence of guilt and the "limited" nature of the government's reliance on the oath of office. *United States v. Pole*, 2024 WL 756781, at *11–12, 15 (D.D.C. Feb. 23, 2024) (*Pole II*).

The court also reinstituted its previous order requiring Pole to pay $75,042.37 in restitution. *Id*. at \*29–30. The court made factual findings about the duration of Pole's fraudulent scheme and the amounts of the bonuses he awarded to himself during it, and the court held that it had authority to order restitution for bonuses paid during the scheme beyond the five payments comprising the specific counts of conviction. *Id.*

## II.

On appeal, Pole first renews his claim that his trial counsel rendered constitutionally ineffective assistance by failing to object to Mogilnicki's testimony about Pole's offer to repay the bonuses or to the government's use of Pole's oath of office in its closing argument. Like the district court, we conclude that even if counsel's failures to object constituted deficient performance, Pole has not carried his burden to demonstrate that the errors were prejudicial.

To prevail on his claim of ineffective assistance of counsel, Pole must show both that his trial counsel's performance "fell below an objective standard of reasonableness" and that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687–88 (1984). To demonstrate prejudice, "[i]t is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington v. Richter*, 562 U.S. 86, 104 (2011) (quoting *Strickland*, 466 U.S. at 693). Rather, Pole must demonstrate a "reasonable probability that," if not for the errors, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. And a "reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Here, there is no reasonable probability that, had counsel successfully made both of the relevant objections, the result of the trial would have been different.

With respect to Mogilnicki's statement that Pole had offered to repay the bonuses he awarded himself, we will assume that the statement would have been excluded had trial counsel objected to it. *See* Fed. R. Evid. 408(a)(1) (prohibiting evidence of "offering" a "valuable consideration in compromising or attempting to compromise" a "disputed claim"). Even so, the exclusion of that testimony would have had a minimal effect on the trial in the overall scheme of things.

While Mogilnicki's testimony about Pole's repayment offer occupies around one page of the trial transcript, Mogilnicki's direct testimony alone took up over a hundred transcript pages. In those remaining hundred-plus pages, Mogilnicki testified, among other things, that only the chief of staff and Senator Kennedy could approve bonuses, that Pole wrote a memorandum describing his role as making "bonus and salary recommendations" (as opposed to decisions), that Pole increased his salary in 2006 and said a week later that "there wasn't enough money for bonuses," and that Mogilnicki thought it "unacceptable" that Pole awarded himself a departure bonus without approval. Trial Tr. 8, 28, 69, 82, Jan. 19, 2011, Dkt. No. 82 (J.A. 454, 474, 515, 528). None of that testimony would have been affected by the exclusion of Mogilnicki's statement about Pole's repayment offer in the meeting with Mogilnicki and Craig.

Plus, the rest of Mogilnicki's testimony about that meeting would have been admitted. That means the jury would have heard about Pole's conflicting explanations for the salary discrepancies Mogilnicki identified, about Pole's sense of entitlement to the bonuses he awarded himself, and about Mogilnicki's impression that Pole admitted during the meeting that he lacked authorization for the bonuses. In that light, Pole's submission that Mogilnicki was the prosecution's "star

witness" (Pole Br. 36) does not advance Pole's cause. Whatever Mogilnicki's alleged "star" status may mean for the significance of his—presumably erroneously admitted—testimony about Pole's repayment offer, Mogilnicki's asserted prominence would also mean that the rest of his—properly admitted—inculpatory testimony would have been especially weighty in the eyes of the jury.

What is more, Mogilnicki's admissible testimony about the meeting was also supported by Craig's testimony. Craig, like Mogilnicki, testified that Pole acknowledged he lacked authorization to award himself the bonuses at issue. Craig, too, described Pole's unpersuasive explanations for why he gave himself sizable bonuses and falsely reported lower amounts to the chiefs of staff. And Craig reinforced Mogilnicki's testimony that Pole expressed he was entitled to the bonuses due to the money he was giving up by staying in the public sector.

Pole at times suggests that much of that incriminating testimony about the meeting was tainted by Mogilnicki's reference to Pole's repayment offer in the meeting. But there is no reason to suppose that the assumed error in admitting the latter testimony—i.e., that it was inadmissible testimony about an offer to compromise, *see* Fed. R. Evid. 408(a)(1)—somehow tainted testimony about other statements in the meeting unrelated to the repayment offer. In short, as the district court observed, counsel's asserted error in failing to object to Mogilnicki's statements about Pole's repayment offer was "limited to a small portion of the trial." *Pole II*, 2024 WL 756781, at *12 (quotation marks omitted).

The government's reliance on Pole's oath of office was similarly "limited to relatively small portions of" the closing arguments and is likewise unlikely to have affected the jury's

deliberations. *United States v. Moore*, 651 F.3d 30, 54 (D.C. Cir. 2011). Even assuming the reference to the oath amounted to an erroneous use of unadmitted evidence in a closing argument and served as a useful introductory frame, the government never again mentioned the oath after referring to it at the outset of the closing. *Pole II*, 2024 WL 756781, at *15. Nor was the reference to the basic oath of office for public servants "particularly egregious" or inflammatory. *Moore*, 651 F.3d at 54 (quotation marks omitted); *compare United States v. North*, 910 F.2d 843, 895 (D.C. Cir. 1990) (prosecutor accused defendants of "following Adolf Hitler's old strategy") (quotation marks omitted).

Additionally, to the extent the mention of Pole's oath of office might have otherwise affected the jury's deliberations, that potential was mitigated by the district court's instructions. Before the government's closing, the court instructed the jury that "the closing arguments of the attorneys . . . are not evidence." Trial Tr. 7, Jan. 31, 2011, Dkt. No. 121 (J.A. 1927). Immediately after closing arguments, the court again told the jurors that the "statements and arguments of the attorneys are not evidence" and that they must decide the case based solely on "evidence properly admitted in the trial." *Id.* at 98–99 (J.A. 2018–19). Directions of that kind can be "strong ameliorative consideration[s] for prosecutorial misconduct" during closing argument given the assumption that jurors follow the court's instructions. *Moore*, 651 F.3d at 54.

As the district court recognized, moreover, the "quantity of" the evidence of Pole's guilt was voluminous. *Pole II*, 2024 WL 756781, at *11 (quoting *United States v. Glover*, 872 F.3d 625, 635 (D.C. Cir. 2017)). As noted, four chiefs of staff who oversaw Pole's work testified that he needed approval from the chief of staff or the Senator before issuing bonuses. A deputy chief of staff testified to the same effect. Pole himself

confirmed that understanding of the office chain of authority in his own email messages and memoranda: he communicated that he was "waiting to get final sign off from the CoS" about bonuses, E-mail to Clara Kircher (July 7, 2024, 10:19 AM) (J.A. 2138), that his role was to make "bonus and salary recommendations that[] need to be approved by the Chief of Staff," Mem. to Chief of Staff, at 3 (Dec. 23, 2005) (J.A. 2159), that he made "bonus proposals," Mem. to Eric, at 1 (June 30, 2006) (Supp. App. 4), and that the bonus amounts were his "suggestion[s]," Trial Tr. 123, Jan. 20, 2011, Dkt. No. 83 (J.A. 832–35). The chiefs of staff also specifically noted that they never approved the bonuses Pole received.

The evidence, moreover, showed that Pole awarded bonuses to himself before he even knew how much surplus would be available to the office, reinforcing that he sought to enrich himself despite lack of approval. Pole also tried to cover his tracks by sharing inaccurate numbers with the chiefs of staff. In fact, the bonus amounts he awarded himself alone suggested a lack of authorization: the chiefs of staff testified that the average end-of-year bonus ranged from $3,000 to $5,000, with $7,000 as an upper limit, whereas Pole's end-of-year bonuses at times exceeded $26,000.

In sum, the evidence against Pole was "overwhelming," which "undercuts any claim that, but for counsel's alleged errors, the outcome of the trial would have been different." *United States v. Green-Remache*, 97 F.4th 30, 35 (D.C. Cir. 2024). The jury's decision ultimately came down to weighing Pole's own word against the word of all five chiefs of staff who worked in Senator Kennedy's office from the late 1990s to 2007, one deputy chief of staff, and Craig. Pole has failed to show that the jury's choice would have been any different had trial counsel objected to Mogilnicki's statements about Pole's

repayment offer and the government's statements about Pole's oath of office.

In arguing otherwise, Pole submits that this was a close case. That impression rests on two notes submitted by the jury suggesting some difficulty reaching unanimity on all counts. But those notes were sent within hours of the start of deliberations, which in total lasted only a day and a half before the jury rendered its unanimous verdict on all counts. Following the verdict, trial counsel asked the district court to poll the jury, and every juror stated on the record that he or she agreed with the jury's decision. Finally, even if the jurors had a meaningful debate during their relatively short-lived deliberations, there is little reason to suppose that those discussions after the three-week trial would have revolved around Mogilnicki's statement that Pole made a repayment offer or the prosecution's reference to Pole's oath of office.

## III.

Pole's remaining challenge concerns the district court's restitution order. The court's order to pay restitution of over $75,000 encompasses all eight unauthorized bonuses Pole obtained for himself between 2003 to 2007. In contesting the restitution order, Pole's principal argument is that the district court lacked authority to require restitution for conduct beyond the specific acts of which he was charged and convicted—the five bonuses underlying the five charged wire fraud counts. The additional three bonus payments, Pole emphasizes, came before and would have fallen outside the applicable statute of limitations had they been charged. We reject Pole's challenge to the restitution order.

The Mandatory Victim Restitution Act (MVRA) requires courts to order "that the defendant make restitution to the

victim" of the offenses in this case. 18 U.S.C. § 3663A(a)(1). The statute defines the term "victim" as "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id*. § 3663A(a)(2). Importantly, the statute goes on to provide that, "in the case of an offense that involves as an element a scheme," the term "victim" "includ[es] . . . any person directly harmed by the defendant's criminal conduct in the course of the scheme." *Id*. It is undisputed that Pole's wire fraud convictions are ones that "involve[] as an element a scheme." *Id.*

The history of the MVRA's language concerning the field of "victims" in a "scheme" case is instructive. A predecessor to the MVRA, the Victim and Witness Protection Act (VWPA), permitted a court to order "a defendant convicted of an offense" to pay restitution to "any victim of such offense," but did not define the term "victim." *Id.* § 3579(a)(1) (1982), codified at *id.* § 3663. In *Hughey v. United States*, 495 U.S. 411 (1990), the Supreme Court held that the VWPA authorizes restitution "only for the loss caused by the specific conduct that is the basis of the offense of conviction." *Id*. at 413. The defendant there pled guilty to one count of unauthorized use of a credit card issued to a particular individual, but the district court ordered restitution for the defendant's use of another 20 cards later tied to him. *Id*. at 413–14. The Supreme Court rejected the reach of the restitution order, holding that the statutory phrase "such offense" referred to the offense of conviction, not related but uncharged offenses. *Id*. at 416.

Later that year, and seemingly in reaction to *Hughey*, Congress amended the restitution statute at issue there to define the "victim" of a fraud "scheme" to include "any person directly harmed by the defendant's criminal conduct in the course of the scheme." Crime Control Act of 1990, Pub. L. No. 101-647, § 2509(2), 104 Stat. 4789 (1990) (codified at 18

U.S.C. § 3663).  The MVRA, enacted a few years later, carried forward the same definition.  *See* Pub. L. No. 104-132, § 204, 110 Stat. 1227 (1996).

Based on the text and history of the MVRA, several courts of appeals have concluded that the Act allows for restitution encompassing all losses attributable to a fraudulent scheme, "including acts outside the statute-of-limitations period" if they are part of the same scheme and at least some discrete acts occurred within the limitation period.  *United States v. Parnell*, 959 F.3d 537, 540 (2d Cir. 2020); *see also United States v. Anieze-Smith*, 923 F.3d 565, 572–73 (9th Cir. 2019); *United States v. Dickerson*, 370 F.3d 1330, 1342–43 (11th Cir. 2004); *United States v. Williams*, 356 Fed. App'x 167, 170–71 (10th Cir. 2009).  The district court followed the lead of those courts in finding that it had the authority to order restitution for all the funds Pole stole.

We have intimated that *Hughey* no longer governs questions related to restitution for "scheme-based offenses." *United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014).  But because of the way Pole frames his challenge, we are not called upon in this case to define the boundaries of a court's restitution authority under the MVRA in "scheme" cases.  Pole does not argue that the terms of the MVRA compel his desired conclusion—i.e. that he should have to pay "only the amount of spend-down bonuses that were the subject of the five counts of wire fraud for which he was convicted."  Pole Br. 49.  Instead, he contends only that our decision in *United States v. Udo*, 795 F.3d 24 (D.C. Cir. 2015), holds that restitution under the MVRA is confined to the specific acts underlying the five wire-fraud counts of the indictment.

That case, however, did not purport to define the reach of the MVRA in scheme-based offenses like the wire-fraud

crimes at issue here. The defendant in *Udo* was convicted of 25 counts of willfully helping taxpayers file materially false tax returns. *Id*. at 27–28. At sentencing, the prosecution sought restitution not only for the 25 false returns but also for "numerous other false returns that the IRS discovered and considered to be part of [the] same criminal scheme." *Id*. at 28. The district court ordered the requested restitution. *Id*. We reversed, explaining that the various "relevant statutes" governing restitution in the case—including the MVRA—generally do not contemplate restitution "for offenses related to, but distinct from, the offenses of conviction." *Id*. at 33. We concluded that it was impermissible to require the defendant to pay restitution related to tax returns beyond those for which he had been convicted, and we emphasized "the government's concession" before our court that the restitution amount was erroneous in those circumstances. *Id*. at 34.

The crime at issue in *Udo* did not contain "as an element a scheme, conspiracy, or pattern of criminal activity." 18 U.S.C. § 3663A(a)(2); *see* 26 U.S.C. § 7206(2) (prohibiting "[w]illfully" aiding or assisting another in filing a tax return "which is fraudulent or is false as to any material matter"). We thus had no occasion to interpret the MVRA's definition of "victim" applicable to scheme-based cases. While the general definition of "victim" is "a person directly and proximately harmed as a result of the commission of an offense," the specific definition in the case of "an offense that involves as an element a scheme" broadly "include[s] . . . any person directly harmed by the defendant's criminal conduct *in the course of the scheme*." 18 U.S.C. § 3663A(a)(2) (emphasis added). Under that language, when the "offense" of conviction "involves as an element a scheme," the range of victims for restitution purposes encompasses not just the specific acts charged in execution of the scheme but generally reaches "criminal conduct in the course of the scheme." *Id.*

Pole points out that the defendant's conduct in *Udo* was characterized in the opinion as a "criminal scheme." 795 F.3d at 28. But the fact that the IRS described the series of crimes as a "criminal scheme"—and that we then quoted the IRS's summary—of course did not purport to determine (or even treat with) which definition of "victim" in the MVRA governed. The answer to that question turns on whether the charged offense "involves as an element a scheme," 18 U.S.C. § 3663A(a)(2), a definition we did not mention, much less consider, in *Udo*. That is unsurprising, as the tax crimes in *Udo* did not "involve as an element a scheme," whereas Pole's wire-fraud charges undisputedly do. *See id.* § 1343.

Given that Pole grounds his argument entirely in *Udo*'s analysis and holding, we decide only that the limits on restitution described in *Udo* for a non-scheme case do not carry over to the scheme-based context. As a result, we have no occasion to consider matters such as whether the eight bonus payments in this case were part of a single scheme within the meaning of the MVRA, whether a district court's authority under the MVRA is limited by the scheme found by a jury, or whether the Sixth Amendment may require the jury to make findings concerning the parameters of a scheme before a court can order restitution for conduct in the course of the scheme. Pole does not raise any of those kinds of challenges.

Finally, we reject Pole's contention that, even if he is wrong in asserting that there is no authority to order restitution beyond the specific acts charged against him, the record still fails to support the district court's restitution order. "The Government must prove at sentencing that its proposed restitution figure is supported by a preponderance of the evidence." *United States v. Bryson*, 485 F.3d 1205, 1208 (D.C.

Cir. 2007).  The restitution amount ordered by the district court readily clears that bar.

The court identified the eight unapproved bonuses forming the basis of its restitution order and cited record evidence for each.  Pole contends that, as to the initial three bonus payments that were not specifically charged as acts executing the fraudulent scheme, there was no evidentiary basis for the district court to conclude that the payments involved a use of interstate wires.  Even assuming—without deciding—that kind of evidence were necessary to support the restitution award, it exists here.  Pole does not dispute that the other five bonus payments involved the use of interstate wires.  As the district court explained, the evidence showed that Pole "awarded himself all" eight of his bonuses "in the same manner—by issuing [forms] to the Senate Disbursing Office to temporarily increase his salary."  *Pole II*, 2024 WL 756781, at *28.  According to testimony from the FBI case agent, those payments were then directly deposited into Pole's bank account in Alexandria, Virginia, which he had used for direct deposit since 1998.  In those circumstances, Pole's evidentiary challenge falls short.

\*   \*   \*   \*   \*

For the foregoing reasons, we affirm the judgment of the district court.

*So ordered.*